816 A.2d 153

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JAMES J. NISHINA, DEFENDANT–APPELLANT.

Argued January 7, 2003—Decided March 4, 2003.

*Mark F. Casazza* argued the cause for appellant (*Rudnick, Addonizio, Pappa & Comer,* attorneys).

*Mary R. Juliano,* Assistant Prosecutor, argued the cause for respondent (*John Kaye,* Monmouth County Prosecutor, attorney).

*Teresa A. Blair,* Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*David Samson,* Attorney General, attorney).

The opinion of the Court was delivered by

VERNIERO, J.

This case implicates defendant's right to be free of unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and the analogous provision under our State Constitution. Specifically, we are called on to examine a pat-down search of defendant's person and a warrantless search of his automobile that yielded, respectively, drug paraphernalia and marijuana. Three lower courts evaluated the actions of the police officer who had conducted those searches, each finding no constitutional violation. We agree and affirm.

## I.

These are the relevant facts, adduced largely from a suppression hearing conducted by the municipal court. We defer to the findings of that court as clarified and restated by the Law Division. *State v. Locurto*, 157 *N.J.* 463, 472–74, 724 *A.2d* 234 (1999); *State v. Johnson*, 42 *N.J.* 146, 157, 199 *A.2d* 809 (1964).

Defendant's encounter with the police took place at approximately 10:00 p.m. on Sunday, April 25, 1999, in Colts Neck. A municipal police officer, Sergeant David Joline, was on routine patrol in "a relatively isolated area" that included the Conover Road School located on Conover Road. At the time of the encounter, the sergeant had been a police officer for approximately sixteen years. As he approached in his unmarked patrol car, the officer noticed four individuals on school property walking approximately three hundred feet from the school building. Sergeant Joline testified that seeing the individuals was "very unusual" because "no activities [were] going on at the Conover Road [S]chool" and "[n]o one is allowed back in the school property after dark."

A Colts Neck ordinance regulates the use of school grounds. It provides, in pertinent part:

The school grounds within the Township of Colts Neck ... shall be open throughout the year 8:00 a.m. until sunset of each day, except from 8:30 a.m. to 3:30 p.m.

on school days.... No person may, in any manner, enter upon, remain on or use the school grounds at times other than those designated herein.

. . . .

The Police Department of the Township of Colts Neck ... in connection with [its] duties imposed by law, shall diligently enforce the provisions of this article, eject from the school grounds any person or persons acting in violation of this article and/or seize and confiscate any property, thing or device ... used in violation of this article.

[Code of the Township of Colts Neck, New Jersey, Article V, §§ 177–37, –39 (1994).]

The officer drove to where the individuals were standing and exited his patrol car "to see what they were doing." The individuals informed him that they were coming back from the playground located behind the school building. That building obstructs the view of the playground from the road. One person, later identified as defendant, told Sergeant Joline that he and his friends "were just driving around and decided to go back [behind the school] because they heard of the playground[.]" Defendant further stated "that they just were hanging out there." At the suppression hearing, the officer described the playground as consisting of "a swing set, you know, stuff for the kids to play on." The record does not indicate defendant's age but presumably, as a licensed driver, he was at least seventeen years old at the time of the encounter. We take judicial notice of the fact that the Conover Road School is a lower elementary school that serves students in kindergarten through the fourth grade.

The officer testified that he had never seen defendant before that evening. Standing "a couple of feet" from the individuals, the officer asked to see defendant's driver's license, registration, and insurance card. He stated that he "wanted to see who owned the car" that defendant had driven to the school to "make sure that the car ... wasn't stolen." The car itself was parked some distance from defendant, across the street from the school on the side of Laurelwood Drive. Sergeant Joline testified that it appeared suspicious to him that defendant's car was parked at that location. As revealed in the record, the school has its own parking lot. Sergeant Joline indicated that he remained with the other

three individuals while defendant walked to his car to obtain his car registration and insurance card.

The officer acknowledged that the Conover Road School was not located in a high crime area and that he had received no calls about any nearby crimes or stolen vehicles. He explained, however, that the police department was "keeping ... [its] eye on the schools" because "that's when all the problems were happening at the schools with ... bomb threats and all of that." As the State indicated before this Court, defendant's encounter with the sergeant had occurred five days after the widely reported incident at Columbine High School in Colorado, in which two student gunmen killed thirteen individuals and wounded several others before taking their own lives. That incident had prompted several perceived "copycat" crimes throughout the country, including one in Elizabeth, New Jersey. There, authorities charged a fourteen-year-old student with making terroristic threats after he allegedly had threatened to blow up his school. Amy Sinatra, *Copycats Threaten Schools,* ABCNEWS.com, *at* http://abcnews.go.com/ sections/us/DailyNews/littleton_threats990428.html (Apr. 29, 1999).

After receiving defendant's car registration and insurance information, Sergeant Joline "smelled a real strong odor of burnt marijuana coming out from [defendant's] clothes." The officer stated that, based on his police training, he had "no doubt in [his] mind" that he had smelled marijuana. After smelling that substance, the sergeant patted down defendant, discovering a pen and a pack of rolling papers. According to his testimony, the officer believed that the rolling papers were drug paraphernalia used for marijuana cigarettes. He then asked defendant if he had any marijuana on his person, to which defendant responded no.

Sergeant Joline then walked to defendant's car and shined his flashlight through the vehicle's window. He saw a clear plastic bag protruding out of the console located to the left of the driver's seat. The sergeant stated that, again based on his training and experience, he believed that the plastic bag contained marijuana, although he acknowledged that he could not see the bag's contents

from outside the car. After opening the car door and removing the bag, the officer saw that it contained "green vegetation" that he suspected was marijuana. For completeness, we note also that another officer joined the sergeant at some juncture but the record does not indicate precisely when that had occurred. (Because the parties do not discuss or address that other officer's conduct, our analysis will focus solely on Sergeant Joline.)

Sergeant Joline arrested defendant and transported him to the police station. Defendant was charged with possession of a controlled dangerous substance, in violation of *N.J.S.A.* 2C:35-10a(4); possession of drug paraphernalia with the intent to use, in violation of *N.J.S.A.* 2C:36-2; and operating a motor vehicle with a controlled dangerous substance, in violation of *N.J.S.A.* 39:4-49.1. Defendant moved to suppress the evidence seized by the officer. The municipal court denied that motion. Defendant pled guilty to the drug possession and drug paraphernalia charges, both disorderly person offenses, conditioned on his right to appeal the denial of his suppression motion. The municipal court sentenced defendant to a six-month suspended jail term, directed him to pay a $350 fine for each offense, and suspended his driver's license for 180 days.

Defendant appealed to the Superior Court, Law Division. After conducting a *de novo* review of the municipal court proceeding, the Law Division clarified certain factual ambiguities and restated the record by highlighting the pertinent facts noted above. It also found that defendant had not carried any packages, exchanged any objects with the other individuals, or threatened the officer's safety.

The Law Division affirmed the denial of defendant's motion, finding that Sergeant Joline had a reasonable, articulable suspicion to perform an investigatory stop. The court agreed with the State "that the subjects walking on school property at that time of night, 10 or 10:30, may appear not only suspicious but also [in] violation of trespass, warranting investigation." The court further explained that the scope of the detention was related to the

justification for the initial stop and that the officer's inspection of defendant's vehicle registration and insurance was the "least intrusive and quickest method to verify ownership of the vehicles and to look into the issue of trespassing." Lastly, the court held that the search of defendant's person and his vehicle were lawful based on the totality of the circumstances and applicable case law.

Defendant appealed to the Appellate Division. In an unreported opinion, the Appellate Division affirmed, with one member of the panel dissenting. Defendant appealed to this Court as of right. *R.* 2:2–1(a)(2).

## II.

The first question is whether Sergeant Joline had a constitutional basis to stop and question defendant prior to searching his person and his car. We begin our analysis by reviewing two forms of police encounters, the first being a so-called field inquiry.

A field inquiry "is a limited form of police investigation that, except for impermissible reasons such as race, may be conducted 'without grounds for suspicion.'" *State v. Rodriguez,* 172 *N.J.* 117, 126, 796 *A.*2d 857 (2002) (quoting *State v. Maryland,* 167 *N.J.* 471, 482, 771 *A.*2d 1220 (2001)). As a general rule, "a police officer properly initiates a field inquiry by approaching an individual on the street, or in another public place, and by asking him if he is willing to answer some questions[.]" *Ibid.* (internal citation and quotation marks omitted) (alteration in original). A permissible inquiry occurs when an officer questions a citizen in a conversational manner that is not harassing, overbearing, or accusatory in nature. *Ibid.*

More intrusive than a field inquiry is a second type of encounter, an investigative detention (sometimes called an investigatory stop or a *Terry* stop). *Ibid.* An encounter escalates from an inquiry to a detention "when an objectively reasonable person feels that his or her right to move has been restricted." *Ibid.* In that circumstance, "[a]n officer does not need a warrant to make

such a stop if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." *Ibid.* (quoting *Terry v. Ohio,* 392 *U.S.* 1, 21, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906 (1968)).

The standard of reasonable suspicion required to uphold an investigative detention is lower than the standard of probable cause necessary to justify an arrest. *State v. Stovall,* 170 *N.J.* 346, 356, 788 *A.*2d 746 (2002). We have explained:

An investigatory stop is valid only if the officer has a "particularized suspicion" based upon an objective observation that the person stopped has been [engaged] or is about to engage in criminal wrongdoing. The "articulable reasons" or "particularized suspicion" of criminal activity must be based upon the law enforcement officer's assessment of the totality of circumstances with which he is faced. Such observations are those that, in view of [the] officer's experience and knowledge, taken together with rational inferences drawn from those facts, reasonabl[y] warrant the limited intrusion upon the individual's freedom.

[*State v. Davis,* 104 *N.J.* 490, 504, 517 *A.*2d 859 (1986).]

The United States Supreme Court has described the reasonable-suspicion standard as requiring "some minimal level of objective justification for making the stop." *United States v. Sokolow,* 490 *U.S.* 1, 7, 109 *S.Ct.* 1581, 1585, 104 *L.Ed.*2d 1, 10 (1989) (internal citation and quotation marks omitted). Its application is highly fact sensitive and, therefore, not "readily, or even usefully, reduced to a neat set of legal rules." *Ibid.* (internal citation and quotation marks omitted). Facts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate, so long as the officer maintains an objectively reasonable belief that the collective circumstances are consistent with criminal conduct. *Stovall, supra,* 170 *N.J.* at 368, 788 *A.*2d 746; *State v. Citarella,* 154 *N.J.* 272, 279–80, 712 *A.*2d 1096 (1998).

In applying those tenets we note that defendant acknowledges that his initial contact with Sergeant Joline was proper for the period during which it constituted a field inquiry. He argues, however, that the encounter quickly was transformed into an investigative detention for which no constitutional justification

existed. In contrast, the State assumes that an investigative detention did occur at some juncture, but argues that Sergeant Joline possessed the requisite suspicion to stop and question defendant in the manner that he did under the totality of circumstances.

■ Assuming that an investigative detention occurred, we agree with the State that it has satisfied the standard necessary to uphold that form of encounter. Looking at "the whole picture," *United States v. Cortez,* 449 *U.S.* 411, 417, 101 *S.Ct.* 690, 695, 66 *L.Ed.*2d 621, 629 (1981), we are persuaded that Sergeant Joline reasonably suspected that defendant "ha[d] been [engaged] or [was] about to engage in criminal wrongdoing." *Davis, supra,* 104 *N.J.* at 504, 517 *A.*2d 859. First, the encounter took place at about ten o'clock on a Sunday night when the school clearly was closed. That fact created a duty for Sergeant Joline to investigate the presence of defendant and his three companions, especially in view of the Colts Neck ordinance mandating that "[n]o person may, in any manner, enter upon, remain on or use the school grounds at times other than those designated[.]"

Second, defendant explained to the officer that he and his friends had driven to the school because they had heard of its playground. Given the time of evening, defendant's mature age, and the officer's testimony that the playground consisted of a swing set "for the kids to play on," defendant's explanation was highly questionable, if not inherently unreliable. In the same vein, the officer must have known that defendant himself did not attend the Conover Road School because it serves students only up to the fourth grade. The time of day and physical location at which a police-citizen encounter takes place are relevant to the analysis. See *State v. Fuqua,* 303 *N.J.Super.* 40, 42, 696 *A.*2d 44 (App.Div.1997) (noting that suspicions of police officers were aroused when they saw car parked at public park at 9:00 p.m. in December). Defendant's explanation buttressed the officer's initial suspicion that defendant was not on school property for an authorized purpose, warranting further investigation.

Third, defendant's car was located some distance from defendant, suggesting that he did not want to draw attention to his presence at the playground, which is located in back of the school. As noted, the Conover Road School has its own parking lot, making it unnecessary to park one's car on the side of Laurelwood Avenue as had defendant. Moreover, Sergeant Joline testified that "there [are] lights in the parking lot[.]" That fact further supports an inference that defendant parked his car across from the school rather than in its illuminated lot to avoid being detected and to conceal possible wrongdoing behind the building.

Based on the foregoing factors we hold that Sergeant Joline was justified in continuing to question defendant and, specifically, in asking for his driver's license, car registration, and other identifying information. Although when viewed in isolation some of the facts might support an innocent interpretation of events, collectively they form a "minimal level of objective justification" for the officer's conduct. *Sokolow, supra,* 490 *U.S.* at 7, 109 *S.Ct.* at 1585, 104 *L.Ed.*2d at 10 (internal citation and quotation marks omitted). In so holding, we agree with the State that the officer's actions remained objectively reasonable throughout the encounter's duration. As the State observes,

> with regard to the duration of the investigative detention, the record suggests that Sergeant Joline stopped the defendant and his associates, immediately asked them what they were doing on school property, and immediately asked them for identifying documentation. When the officer ascertained that the suspects were proceeding to vehicles parked on a side street, he did not delay in asking for the registration and insurance documentation for those vehicles. The record suggests that all of the officer's conduct and questions were directed at the legitimate end of determining the identity of the suspects and what their business was at the abandoned schoolyard after 10:00 p.m. There is nothing to suggest that Sergeant Joline delayed the investigation to harass, frighten, embarrass, or humiliate defendant. There is nothing to suggest defendant was detained for an unreasonable or excessive period of time prior to his formal arrest.

Urging a contrary conclusion, defense counsel emphasizes that defendant had presented valid credentials in response to Sergeant Joline's questions, and that defendant's conduct did not satisfy the legal elements of trespass. Nor did the police formally charge defendant with that offense. Without a trespass or some other

violation, counsel argues that the "stop of defendant was arbitrary, random, and wholly without justification." Succinctly stated, he contends that "there was nothing in the [s]ergeant's testimony that could reasonably formulate the articulable suspicion required to validate the investigatory stop." Defendant thus argues that all evidence seized as a result of the searches must be suppressed.

We disagree. We already have noted the facts that supported Sergeant Joline's conduct at the time of the encounter. In addition, we are persuaded that the heightened concern over school safety, occurring as it did in the immediate aftermath of the Columbine incident, contributed to the reasonableness of the officer's reaction in seeing defendant and his associates at the school late on a Sunday evening. That the officer might have lacked probable cause to charge defendant with trespass is not dispositive. We reiterate that probable cause is not the standard for an investigative detention. That said, we do not suggest that Sergeant Joline possessed overwhelming evidence to believe that defendant had trespassed on school property for an unlawful purpose. The information that he did possess, however, was sufficient to satisfy the requirement of reasonable suspicion, which remains the critical test under State and federal case law. The officer's brief investigative detention of defendant passes constitutional muster.

### III.

Having concluded that Sergeant Joline had a constitutional basis to stop and question defendant, we next must evaluate whether the officer's pat-down search of defendant and the warrantless search of his car are sustainable. We start with the search of defendant's person.

■ Perhaps the most familiar circumstance of a warrantless pat-down search is a so-called *Terry* search. Under *Terry, supra,* an officer is permitted to pat down a citizen's outer clothing when the officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable

cause to arrest the individual for a crime." 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d. at 909. *See also State v. Thomas*, 110 *N.J.* 673, 679, 542 *A.*2d 912 (1988) (authorizing *Terry* searches when facts "give rise to an objectively reasonable suspicion that a suspect is armed and dangerous"). In view of the Law Division's finding that Sergeant Joline did not fear for his personal safety, we conclude that he was not authorized to conduct a *Terry* search of defendant.

The inquiry, however, does not end there. Although warrantless searches outside of *Terry* are "presumed invalid," *State v. Cooke*, 163 *N.J.* 657, 664, 751 *A.*2d 92 (2000), our courts have permitted them in narrow circumstances. One such circumstance is when an officer has probable cause to believe that a crime has been or is about to be committed and the officer is faced with exigent circumstances. *State v. DeLuca*, 168 *N.J.* 626, 632–33, 775 *A.*2d 1284 (2001). When that exception to the warrant requirement is claimed, "the burden is on the State to prove that its search was permissible." *Id.* at 632, 775 *A.*2d 1284; *see generally Cooke, supra*, 163 *N.J.* at 667–71, 751 *A.*2d 92 (outlining cases requiring both probable cause and exigency under warrant rule's automobile exception).

"Probable cause exists if at the time of the police action there is a well-grounded suspicion that a crime has been or is being committed." *State v. Sullivan*, 169 *N.J.* 204, 211, 777 *A.*2d 60 (2001) (internal citation and quotation marks omitted). The standard "def[ies] scientific precision." *State v. Evers*, 175 *N.J.* 355, 815 *A.*2d 432 (2003). We have explained, however, that "[i]t requires nothing more than a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Johnson*, 171 *N.J.* 192, 214, 793 *A.*2d 619 (2002) (internal citation and quotation marks omitted) (alteration in original).

New Jersey courts have recognized that the smell of marijuana itself constitutes probable cause "that a criminal offense ha[s]

been committed and that additional contraband might be present." *State v. Vanderveer,* 285 *N.J.Super.* 475, 479, 667 *A.*2d 382 (App. Div.1995). In *Vanderveer,* a police officer encountered two individuals on an outdoor porch and observed two individuals standing near the curb. While on the porch, the officer detected "the distinctive odor of burnt and raw marijuana." *Id.* at 477, 667 *A.*2d 382. The court held that the smell of marijuana gave rise to probable cause "to conduct a warrantless search of the persons in the immediate area from where the smell [had] emanated." *Id.* at 481, 667 *A.*2d 382. It also concluded that "[e]xigent circumstances clearly were present ... to justify a warrantless search." *Ibid.*

In reaching its holding, *Vanderveer* relied on an earlier decision, *State v. Judge,* 275 *N.J.Super.* 194, 645 *A.*2d 1224 (App.Div.1994). In *Judge,* the Appellate Division upheld a warrantless automobile search in a case in which a trained and experienced police officer had "detected the odor of burnt marijuana" emanating from a stopped vehicle. *Id.* at 197, 645 *A.*2d 1224. Writing for the court, Judge (now Justice) Coleman explained:

> Unlike the smell of alcohol emanating from the passenger compartment of a stopped motor vehicle, or even on the breath of the driver, both of which might be lawful, using or possessing marijuana in a motor vehicle in New Jersey is a *per se* violation of the laws of this State.... Thus, the smell of burnt marijuana under the total circumstances created a heightened and reasonable suspicion that an offense was being committed. We are persuaded that under the totality of the circumstances, probable cause was established.
>
> [*Id.* at 202, 645 *A.*2d 1224.]

*See also* Annotation, *Odor of Narcotics As Providing Probable Cause For a Warrantless Search,* 5 *A.L.R.*4th 681 (1981) (surveying relevant case law).

Similar to probable cause, "the term 'exigent circumstances' is, by design, inexact. It is incapable of precise definition because, by its nature, the term takes on form and shape depending on the facts of any given case." *Cooke, supra,* 163 *N.J.* at 676, 751 *A.*2d 92. We have observed, for example, that "[e]xigent circumstances may exist if the unanticipated circumstances that give rise to probable cause occur swiftly." *Id.* at 672, 751 *A.*2d 92. As with so much of our search-and-seizure jurisprudence, "the

application of the doctrine of exigent circumstances demands a fact-sensitive, objective analysis." *DeLuca, supra,* 168 *N.J.* at 632, 775 *A.*2d 1284.

We turn to the facts before us. Consistent with the Law Division's findings, we assume that the officer did not immediately smell marijuana because when the encounter began he was positioned "a couple of feet" from defendant. The officer smelled the drug as the encounter continued, namely, when defendant returned from his car with his vehicle registration and insurance card. We base our disposition on that chronology, as accepted by the Law Division, and on the case law just cited. We are satisfied that Sergeant Joline, relying on his training and experience, had probable cause to believe that defendant possessed illegal narcotics once he detected an odor of marijuana on defendant's clothing.

Regarding exigency, we echo the rationale expressed by the Appellate Division in *State v. Guerrero,* 232 *N.J.Super.* 507, 557 *A.*2d 713 (App.Div.1989). In that case, the police suspected that a drug transaction had occurred and thereafter searched and discovered marijuana on the defendant's person, specifically in his shoes. *Id.* at 511, 557 *A.*2d 713. After finding probable cause, the court addressed the issue of exigency, stating that "the officers certainly had no time in which to procure a warrant to search defendant because the evidence very well could have been consumed, hidden or sold by the time such a warrant was issued." *Id.* at 512, 557 *A.*2d 713. So too, here. Sergeant Joline had no practical opportunity to secure a warrant once faced with an immediate and well-grounded suspicion that defendant illegally possessed marijuana in the officer's presence.

We follow a like rationale in upholding the search of defendant's car. The officer had smelled marijuana on defendant's person (after defendant had returned from the car), discovered drug paraphernalia as a result of a lawful search of defendant's person, and observed in plain view a plastic bag protruding from the interior console of the car itself. (Sergeant Joline's use of his flashlight to view the plastic bag did not transform an

otherwise proper plain-view observation into an impermissible search. *Johnson, supra,* 171 *N.J.* at 210, 793 *A.*2d 619.) Those facts amply supplied the officer with probable cause to suspect that drugs would be found in defendant's vehicle.

With respect to exigent circumstances, we again note that events were occurring swiftly, making it impractical for the officer to obtain a warrant once he had observed the plastic bag. Further, given the presence of defendant's companions, it would have been reasonable for Sergeant Joline to assume that other third parties might have had knowledge of the marijuana and that "those same parties could have attempted to remove or destroy the drugs in the time necessary to obtain the warrant[.]" *Cooke, supra,* 163 *N.J.* at 675, 751 *A.*2d 92. We are persuaded on the facts before us that "it would [have been] unduly burdensome and unreasonably restrictive to require the police to post a guard and repair to the courthouse for a warrant once they [had] probable cause to search the car." *Id.* at 674, 751 *A.*2d 92 (internal citations and quotation marks omitted) (alteration in original).

Accordingly, we hold that the search of defendant's outer clothing is sustainable not as a *Terry* protective search, but as a search based on probable cause and exigency. Based on those same factors, we further hold that the officer's search of defendant's car was valid under the automobile exception to the warrant requirement.

### IV.

To summarize: The officer here had the requisite reasonable suspicion to stop and ask defendant for identifying information under the totality of the circumstances. During the course of that lawful encounter, the officer smelled marijuana emanating from defendant's clothing. The smell justified the subsequent pat-down search of defendant that yielded a packet of rolling papers the officer reasonably believed was drug paraphernalia. In addition, the officer observed in plain view a plastic bag protruding from the interior console of defendant's car. The bag, together with the

marijuana smell and drug paraphernalia, in turn provided probable cause to suspect that the car contained illegal drugs. The combined elements of probable cause and exigency permitted the officer's search of defendant's car under the automobile exception to the warrant requirement.

## V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

*Opposed*—None.