**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1458-18T4

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

JOSE GUZMAN,

    Defendant-Respondent.

_____

Argued March 18, 2019 – Decided April 12, 2019

Before Judges Sabatino and Sumners.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-04-0571.

Ian C. Kennedy, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for appellant (Dennis Calo, Acting Bergen County Prosecutor, attorney; Ian C. Kennedy, of counsel and on the briefs).

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the briefs).

PER CURIAM

The State's interlocutory appeal in this case concerns a field inquiry by police officers that escalated to a "Terry" stop[1] and ultimately to defendant's arrest and the seizure of illegal drugs from his person. Specifically, the State seeks reversal of the trial court's October 30, 2018 decision suppressing certain evidence. The police obtained the evidence through a warrantless search and interrogation of defendant at a diner, upon responding to a 9-1-1 call.

For the reasons we shall explain, we remand this matter to allow the trial court to clarify and amplify its factual findings concerning the exact sequence of events at the diner. In particular, we request findings addressing the legally critical issue of whether the moment the police first posed accusatory questions to defendant – inquiring if he was under the influence of drugs or alcohol – occurred before or after police interviewed defendant's girlfriend at the scene. We also ask the trial court to reconsider its self-incrimination ruling in light of those more specific factual findings and in light of additional legal authority.

---

[1] Terry v. Ohio, 392 U.S. 1 (1968) (recognizing an exception to the Fourth Amendment allowing police officers to conduct a brief investigatory stop-and-frisk of a person in order to confirm the officers' reasonable and articulable suspicion of that person's involvement in criminal activity).

A-1458-18T4

I.

The State has charged defendant Jose Guzman with second-degree possession of a controlled dangerous substance ("CDS"), namely cocaine, with the intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(2) (count one); third-degree possession of a CDS, namely cocaine, N.J.S.A. 2C:35-10(a)(1) (count two); and fourth-degree making a false 9-1-1 call, N.J.S.A. 2C:33-3(e) (count three).

The State's case is largely predicated upon narcotics, statements, and other incriminating evidence that South Hackensack police officers obtained from defendant without a warrant and without Miranda[2] warnings. Defendant moved to suppress the seized evidence and statements.

The trial court conducted a suppression hearing over two days. At that hearing, the two police officers who participated in the search testified for the State. Defendant presented testimony from a police dispatcher, and also testimony from his girlfriend,[3] with whom defendant has several children.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] The record is unclear as to the exact nature of defendant's relationship with his significant other. When asked to describe her relationship with defendant at the hearing she testified, "[t]hat's my legally – or not, I guess, 'Cause we were married." For simplicity, we refer to defendant's significant other as his girlfriend.

A-1458-18T4

A.

The following salient facts, which are discussed in more detail in the trial court's written decision, emerged at the suppression hearing.

At approximately 9:30 p.m. on October 1, 2016, Police Officer Matthew Orefice and Detective Brian Kropp, who was a patrolman at the time of the incident, responded to a 9-1-1 call, in which a male caller reported that he had been threatened by another man. Officer Orefice testified that he was "dispatched by headquarters for a man being threatened with a gun" to a diner on Route 46, and that he responded to the location in under a minute. Orefice testified that Kropp responded at or around the same time in a different vehicle.

A contested issue at the suppression hearing was what the responding officers knew about the situation before arriving at the diner. In the transcript of the 9-1-1 call, the Bergen County 9-1-1 operator told South Hackensack Dispatcher Anthony Moreno that the caller had reported that "45 minutes ago a male threatened to kill him," and that when the caller got to the diner he saw the man. The caller identified the man who threatened him and spelled the man's name. When asked by the 9-1-1 operator, the caller said he would like to make a report.

A-1458-18T4

Dispatcher Moreno testified that, after getting off the phone with the 9-1-1 operator, he advised Officers Kropp and Orefice of the call, and dispatched them from headquarters. According to Moreno, he "advised them that a male party stated that somebody else had threatened to kill him and he was at the [diner]," but could not remember if he provided the officers with any other information. Orefice recalled in his testimony that he was dispatched to the diner for "a man being threatened with a gun."

Upon arriving, Orefice and Kropp "saw that there was no immediate frantic of the public." The officers walked inside the diner and "everything seemed to be normal." They asked an employee at the cash register if anyone had placed a 9-1-1 call. The employee was "shocked" to see the police and said everything had been okay. The officers noticed a man at the bar area of the diner looking at them.

After speaking with the employee, the officers addressed the diner occupants generally, asking if anyone had called 9-1-1 and if anyone needed help. No one answered for a few minutes. The officers were about to walk out when, according to Orefice's testimony, a male individual seated by the bar area – later identified as defendant – "screamed out." He exclaimed, "Wait. I called 9-1-1."

The officers asked the man to step into the diner's foyer with them to talk about why he had called 9-1-1. The foyer is located in the area where customers enter the diner and a glass door separates it from the main restaurant. Orefice testified that they felt it was not appropriate to discuss the 9-1-1 call inside a diner with all the customers and employees there. At some point, the officers and defendant moved from the foyer to outside the diner.

Orefice testified that he and Kropp asked defendant what was going on, if he was all right, and to explain what was happening. According to Orefice, defendant told the officers that "a man with a gun" had threatened him forty-five minutes earlier. However, defendant could not tell the officers anything about that man – such as his name or what he looked like. Orefice testified that defendant only told them that the gun-toting man "had a bulge coming from his pants."

Orefice's written report states that defendant said he was threatened by the man forty-five minutes earlier, and that defendant explained he "overheard from [his] girlfriend that he wanted to kill me." Orefice also testified that defendant said that his girlfriend was "trying to set him up to be killed." Defendant denied to Officer Orefice that any other events in the past could have led to this man

threatening him. Because Orefice felt that defendant's account was not making sense, he asked defendant to clarify his narrative about three times.

According to Orefice, when he was speaking with defendant, he observed that defendant "had a very dry mouth." As described by Orefice, "white stuff was starting to form around [defendant's] lips. He was very fidgety. He . . . couldn't really stare at us straight in the eye. He couldn't really tell us exactly what was going on." Both officers testified that defendant was grinding his teeth.

Both Orefice and Kropp found defendant's behavior suspicious. Kropp remembered that defendant "seemed really nervous." Kropp also recalled that defendant was clenching his fists, glancing up and down when asked questions, and moving his jaw back and forth. Kropp demonstrated these movements for the court at the hearing.

Officer Kropp testified on direct examination that he had believed defendant was under the influence of narcotics: specifically cocaine or crack cocaine. However, on cross-examination, Kropp conceded that he was not sure if it was alcohol or narcotics at this point in the encounter. Similarly, Orefice testified that he was not initially sure if defendant was under the influence of alcohol or narcotics. Orefice's police report stated that the police officers

A-1458-18T4

"immediately realized" defendant was "under the influence of narcotics or alcohol."[4]

At some point, defendant's girlfriend arrived at the diner. She was driving a car and accompanied by her five children.

Kropp testified that he went over to the girlfriend's car and asked her about defendant's claim that he had overheard a threat. According to Kropp, the girlfriend initially dismissed defendant's report. She reportedly told Kropp, "[Defendant] gets like this from time to time when he uses drugs, and he may have been high at the time." Upon hearing this, Kropp went back to where defendant was with Orefice.

The girlfriend provided a different version of events. According to her testimony, defendant had called her to come get him at the diner. She estimated it took her around fifteen to twenty minutes to get there. When she arrived, Kropp came over. She told Kropp she was there to pick defendant up. Kropp went back to defendant. Kropp then returned, and asked her if defendant was "high." She contends she answered no. According to the girlfriend, she would

---

[4] Alcohol was served at the diner, although there is no evidence, either way, as to whether defendant consumed alcohol on the premises.

not have said defendant was "high," because her children were with her and they did not know defendant had an addiction.

At some unclear point in time, Orefice asked defendant if the incident with the gun-toting man had actually happened and if he was under the influence of narcotics. Defendant allegedly responded, "No. I don't want a report anymore. Please just don't lock me up." Orefice then asked defendant when was the last time he used narcotics. According to the officer, defendant admitted at that point to using "narcotics" a couple hours earlier.

Once defendant admitted to using narcotics, the officers decided to place him under arrest. Kropp testified that his decision was based on defendant's behavior, which indicated to Kropp he was under the influence of a narcotic and led the officers to believe the threat never occurred. In this regard, Orefice's report states "[t]hrough our observations of [defendant], [the girlfriend's] statements and [defendant's] statements we placed [defendant] under arrest for being under the influence in violation of [N.J.S.A.] 2C:35-10B and raising a false public alarm in violation of [N.J.S.A.] 2C:33-3E."

According to Orefice, before searching defendant he "gave [defendant] the opportunity to be honest," and asked if he had anything on him. Defendant denied having anything on him. The officers then searched defendant's person

before placing him in handcuffs. In the course of that search, the officers discovered and seized approximately four bags of a white powdery substance and a scale in defendant's jacket pocket, as well as $909 in cash.

Orefice contended the search of defendant's person had "no bearing" on if the officers were going to arrest him, and the search was only "to see if he had anything on him before we placed him in our patrol vehicle." Kropp testified that he believed defendant had already been advised that he was under arrest prior to the search.

The officers placed defendant in handcuffs and read him his Miranda rights. Orefice estimated it was approximately between forty-five minutes and an hour from the time the officers arrived at the diner to the time they placed defendant in handcuffs. Orefice testified that the search was incident to arrest for making a false public alarm and for being under the influence.

Orefice testified that defendant was not free to leave before he was placed in handcuffs. The officers elected to search defendant before placing him in handcuffs because defendant was "non-combative" and not a "flight risk."

B.

Upon sifting through this evidence, the judge granted defendant's motion to suppress. The judge issued a thirty-one-page written opinion detailing her

10

reasoning. In particular, the judge found that the police officers had a legitimate constitutional basis to perform a field inquiry when they came to the diner in response to the 9-1-1 call. However, the judge determined the field inquiry transitioned to an investigatory "Terry" stop – "at the very latest" – when Officer Orefice posed accusatory questions to defendant about whether he was under the influence of drugs or alcohol. The judge reasoned from the evidence that the police – at that point – did not yet have reasonable suspicion of criminal wrongdoing on the part of defendant to justify his investigatory detention.

As part of her analysis, the judge found unpersuasive Orefice's testimony about defendant appearing to be under the influence, noting the officer's relatively limited experience in drug recognition. The judge also gave little weight to Kropp's testimony on this subject, noting his inability to remember many details of the events and that his testimony appeared to consist of "largely after-the-fact justifications." Additionally, the judge expressed doubts about the girlfriend's statements and voiced concerns about the reasonableness of the officer's acceptance of and reliance upon her story. For these and other reasons, the judge suppressed inculpatory items seized from defendant after his arrest, due to the taint of the invalid Terry stop.

A-1458-18T4

Lastly, the judge suppressed defendant's incriminating statements made to the police without defendant first being administered <u>Miranda</u> warnings. The judge concluded that defendant had not been free to leave the scene, and that the police queries amounted to a custodial interrogation "at least by the point" Orefice asked defendant about his CDS use a second time.

The State timely moved for leave to appeal these rulings. We granted the motion and now have the benefit of counsel's helpful briefing, oral arguments, and post-argument submissions.

C.

On appeal, the State argues the trial court erred in concluding the police violated defendant's Fourth Amendment rights during their interactions with him at the diner. The State contends that the officers' inquiries of defendant did not convert a permissible field inquiry into an investigative detention under <u>Terry</u>. Alternatively, the State maintains the officers had reasonable suspicion of criminal activity to justify a lawful investigative detention. As part of its contentions, the State asserts that the inquiries of defendant about his possible criminal use of drugs did not occur until after the officers had learned from his girlfriend about his tendency to become impaired by drugs and act oddly.

The State further argues that once the police obtained information from defendant and his girlfriend indicative of his criminal conduct, they had probable cause to arrest him. The drugs on his person were therefore permissibly seized without a warrant as a search incident to an arrest. The State also maintains the incriminating statements defendant made to the police were admissible and did not have to be preceded by Miranda warnings.

## II.

Our scope of applicable review of the trial judge's suppression rulings has mixed aspects. We must defer to the judge's factual findings "so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015). We particularly give deference to the judge's assessment of the witnesses' credibility and her "observations of [those witnesses'] character and demeanor . . . that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999). On the other hand, we review de novo the trial judge's conclusions of law. State v. Hinton, 216 N.J. 211, 228 (2013).

Guided by these well-established principles, we have reviewed the record of the two-day suppression hearing and the judge's extensive written decision that explains in considerable depth the evidence and the judge's legal analysis.

A-1458-18T4

In undertaking that review, we have accorded deference to the judge's factual findings and her detailed assessment of the credibility of the witnesses. We have particularly noted the judge's expressed concerns about the weight of the testimony of the police officers, which she elaborates upon in her written decision.

With respect to Officer Orefice, the judge found that he only had an "inarticulate hunch" that defendant possessed or used a CDS. The judge found unpersuasive Orefice's testimony that defendant appeared to have dry lips and an unspecified "white matter" around his mouth, which the judge suggested could have been dried spittle. The judge also was not persuaded by the officer's perception that defendant had fidgeted and did not maintain eye contact, noting that Orefice had also acknowledged that, as the judge put it, defendant "was otherwise composed and acting safely while they spoke."

The judge separately expressed doubts about the credibility of Detective Kropp's testimony, which she found was "clearly designed to bolster and elaborate upon Orefice's testimony and police report." The judge further was unpersuaded by Kropp's in-court demonstration of defendant's movements. She noted that the demonstration "was consistent with" defendant's appearance and

demeanor, "but possibly exaggerated" and emphasized head-jerking and fist-making movements that were not mentioned in Orefice's police report.

In evaluating Officer Orefice's testimony, the judge found significant that the officer, although he was generally credible in other respects, had "little experience in this area [of CDS offenses] from which to draw any inferences." The judge underscored that Orefice had at that time only been a police officer for a short time, "had no official training with detecting drugs, and did not confirm how much of his involvement with CDS offenses came before the instant case." She was not particularly impressed by his experience with an estimated "over 50 people under the influence during his tour of duty." The judge further noted that Orefice "admitted he could not determine if alcohol or narcotics [i.e., CDS] was more likely to be the substance of which [d]efendant may have been under the influence[.]"

On appeal, the State argues, among other things, that we should disregard the judge's criticisms of Officer Orefice's credibility insofar as they relate to his relative level of experience. The State maintains that an analysis of the constitutionality of a warrantless search should not be affected by a testifying officer's past training and experience. We respectfully reject that proposition. As the trier of fact at the suppression hearing, the judge was entitled to consider

a host of factors in evaluating the credibility of each witness who appeared before her. Indeed, we take judicial notice that prosecutors commonly present the credentials of testifying law enforcement officers, whether they are called as fact or expert witnesses, and commonly urge judges and juries to consider as a positive credibility factor the officers' training and experience when it is extensive. See, e.g., State v. Gonzales, 227 N.J. 77, 102-03 (2016); State v. McLean, 205 N.J. 438, 459 (2011). We likewise embrace the converse proposition of treating an officer's relative lack of experience as a negative credibility factor.

We realize the ultimate constitutional analysis under the Fourth Amendment concerns a question of law that involves an objective assessment of what a reasonable police officer would do or perceive in a particular situation. State v. Bruzzese, 94 N.J. 210, 219 (1983). Even so, a judge hearing a suppression motion is entitled to take into account an officer's experience or inexperience in assessing the believability of his or her testimony about what he or she observed out in the field.

With this point aside, we generally adopt the trial court's findings and legal analysis, except for important caveats we now discuss, infra.

As defendant concedes, the police had a lawful basis to perform a field inquiry at the diner in response to the 9-1-1 call and dispatch report.  See State v. Pineiro, 181 N.J. 13, 20 (2004) (defining a field inquiry as "the least intrusive encounter," which occurs when a police officer approaches a person and asks if he or she is willing to answer some questions).  Field inquiries are "a limited form of police investigation that, except for impermissible reasons such as race, may be conducted 'without grounds for suspicion.'"  State v. Nishina, 175 N.J. 502, 510 (2003) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)).  "A field inquiry is permissible so long as the questions '[are] not harassing, overbearing or accusatory in nature.'"  Pineiro, 181 N.J. at 20 (alteration in original) (quoting Nishina, 175 N.J. at 510).  During such a field inquiry, "[t]he person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way."  State v. Maryland, 167 N.J. 471, 483 (2001) (quoting Florida v. Royer, 460 U.S. 491, 497-98 (1983)); see also State v. Rosario, 229 N.J. 263, 271-72 (2017).

We agree with the trial judge that, up until the point where Officer Orefice began to pose accusatory questions to defendant about when he last used a CDS, the police appropriately were conducting a field inquiry into defendant's report of a man allegedly threatening him with a firearm.  The police surely had the

17

right and responsibility to investigate such a report as a matter of public safety. The decision to ask defendant to step out of the dining area into the lobby away from the patrons to discuss the report of a man with a dangerous weapon was sensible and surely constitutional. We also have no problem with the police asking defendant several times to clarify his explanation concerning the 9-1-1 report, particularly since his responses appeared to be largely nonsensical.

As the trial judge correctly recognized, at some point this police encounter with defendant at the diner escalated into an investigative detention under Terry. The Terry exception to the warrant requirement permits a police officer to detain an individual for a brief period, and to pat him down for the officer's safety, if that stop is "based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." Rodriguez, 172 N.J. at 126 (quoting Terry, 392 U.S. at 21). Under this well-established standard, "[a]n investigatory stop is valid only if the officer has a 'particularized suspicion' based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing." State v. Davis, 104 N.J. 490, 504 (1986). Reasonable suspicion "involves a significantly lower degree of objective evidentiary justification than does the probable cause test," id. at 501, and "innocent circumstances in the aggregate

can support a finding of reasonable suspicion." State v. Stovall, 170 N.J. 346, 368 (2002); see also State v. Chisum, ___ N.J. ___ (2019) (slip op. at 17-19) (reiterating Terry principles).

A field inquiry evolves into an investigatory detention "when an objectively reasonable person feels that his or her right to move has been restricted." Nishina, 175 N.J. at 510 (quoting Rodriguez, 172 N.J. at 126). The pivotal issue here is exactly when that occurred.

In her written opinion, the trial judge stated that, "At the very least, by the time [Officer Orefice] asked [d]efendant if he was under the influence of drugs or alcohol for the first time, Orefice had detained [d]efendant as part of a Terry stop." Unfortunately, the judge's opinion is unclear as to whether that particular point in time occurred before or after the officers had interviewed defendant's girlfriend and allegedly obtained information from her about defendant's past drug use and behavior.

The State contends, and we agree, that if the time of accusatory drug-related questioning of defendant took place after the interview of the girlfriend (despite her credibility issues noted by the judge), then the police had reasonable suspicion to conduct an investigative detention of him. Defense counsel on appeal does not gainsay this proposition, but asserts that the critical point in time

actually occurred before the police interview of the girlfriend. Defendant maintains that the judge correctly found the police lacked reasonable suspicion to escalate the encounter to a <u>Terry</u> stop at that juncture.

Unfortunately, the judge's findings and the proofs in the record are unclear about this pivotal factual question. Orefice's police report indicates he asked defendant about drug use at least two times. The report describes these two queries as occurring after the girlfriend arrived and was interviewed. In his testimony at the hearing, Orefice stated he asked defendant if he had used drugs, which defendant denied, and that "[l]ater on, after we got a little bit more information, we asked him again . . . ." His testimony on cross-examination did not eliminate the ambiguity. His testimony is imprecise as to the timing of his inquiries.

Detective Kropp's testimony does not conclusively resolve the timing issue, either. Kropp acknowledges that the police did ask defendant several times whether he had used drugs. The first inquiry apparently occurred following defendant's assertion that he did not want to file a report about an armed threatening man and did not want to be "locked up." The transcript shows that this first inquiry occurred "at some point" in time.

Given the murkiness of the record and the need for more clarity in the judge's findings on this key point, we are constrained to remand for further proceedings. The scope of the remand is a narrow one: to resolve whether the police first asked defendant accusatory questions about drug use before they interviewed his girlfriend. If the answer is yes, then we generally[5] agree with and adopt the judge's legal analysis under the Fourth Amendment and her conclusion of unconstitutionality.

In particular, we are persuaded that, before speaking with the girlfriend, the police lacked reasonable suspicion to conduct an investigatory detention and ask defendant accusatory questions about his drug use. On the other hand, if the trial judge finds factually that the interview with the girlfriend preceded the accusatory questioning about drug use, then we agree with the State that they had reasonable suspicion to conduct an investigative detention on that basis.

On remand, the trial judge is free in her discretion to allow additional testimony or other proof relevant to the sequence issue. Depending on the outcome of that finding, the judge should also reconsider her Miranda analysis

---

[5] As a minor point of difference we agree with State – as defendant concedes – that if the police had probable cause to arrest defendant, then the search incident to his arrest was proper regardless of what the police expected it would yield. See Chimel v. California, 395 U.S. 752, 762-63 (1969); State v. Minitee, 210 N.J. 307, 318 (2012).

A-1458-18T4

and whether defendant's unwarned statements are the fruits of a poisonous tree of an illegal stop, or, conversely, whether his unwarned statements taint the underlying foundation for probable cause to arrest and search him.

The remand shall be completed within sixty days, unless reasonably extended by the trial court with consent of counsel. Counsel shall forthwith supply to the trial court courtesy copies of their appellate submissions. Following the determination on remand, an aggrieved party may pursue further appellate relief in a new appeal or motion for leave to appeal, as the case may be.

Remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1458-18T4