**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3722-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSEPH BLACKHAM,

     Defendant-Appellant.

_____

> Submitted October 27, 2025 – Decided November 21, 2025
>
> Before Judges Sabatino and Walcott-Henderson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Morris County, Municipal Appeal No. 23-022-A.
>
> O'Toole Scrivo, LLC, attorneys for appellant (Joseph J. McGlone, of counsel and on the briefs; Valerie L. Murphy, on the briefs).
>
> Robert J. Carroll, Morris County Prosecutor, attorney for respondent (Robert J. Lombardo, Assistant Prosecutor, on the brief).

PER CURIAM

In this driving while intoxicated ("DWI") case, the State relied on the community caretaking doctrine to justify the police's encounter with defendant Joseph Blackham and his parked motor vehicle. Because the municipal court and the Law Division legally erred in finding the elements of community caretaking were met here, we reverse defendant's DWI conviction.

The record reflects the following relevant facts and circumstances. At approximately midnight on June 14, 2021, four police officers were dispatched to defendant's residence in Netcong to respond to what was described as "a verbal dispute." The dispatched officers included Officers Daniel LaManna and Richard Barbini of the Netcong Borough Police Department and Sergeant Guy Mariani of the Byram Township Police Department, along with an additional officer from a different department.

The officers found at the residence two persons involved in the verbal dispute: defendant and an adult woman ("the cohabitant") who reportedly had been living with defendant for about eleven years as of the incident. According to Officer LaManna's testimony at the municipal trial, both defendant and the cohabitant "explained that they were drinking that evening." As described by LaManna, defendant exhibited slurred speech and had "the odor of [an] alcoholic beverage," causing LaManna to perceive that defendant was then intoxicated.

2

Eventually, the verbal dispute was resolved, with the cohabitant "walking away" after the officers suggested she do so to de-escalate the situation. The police then left the residence without issuing any summonses or taking further action.

Later that night, at 3:08 a.m., Sergeant Mariana called Officer LaManna on his cell phone and told LaManna that he had just seen defendant driving a vehicle. Specifically, the sergeant reported that he had seen the cohabitant "walking across Route 46 at the time, [and] get picked up in a green Jeep." Based on LaManna's knowledge "from previous calls," he recognized the Jeep as a vehicle that defendant and the cohabitant shared.

Prompted by the sergeant's phone call, Officer LaManna then drove to defendant's residence and observed a green Jeep parked in front of his house. As recounted by LaManna, the Jeep "was still running with the lights on, and [the cohabitant] was in the passenger seat and [defendant] was in the driver's seat."

After Officer LaManna activated his squad car's lights, the Jeep's ignition got turned off, and both defendant and the cohabitant allegedly "jumped out of the car." Defendant went towards the Jeep's trunk and announced to LaManna that he was closing it.

3

Officer Barbini arrived at the scene shortly thereafter and administered to defendant standard field sobriety tests ("SFSTs"). He did so based on Officer LaManna's belief that the tests were appropriate, given "the odor of an alcoholic beverage emanating" from defendant's breath, his "swaying," and his "bloodshot and watery [eyes.]"

Officer Barbini testified that defendant did not perform the SFSTs in a satisfactory manner.[1] Consequently, the police transported defendant to the Roxbury Police Department for an Alcotest. The Alcotest revealed that defendant had a blood alcohol concentration ("BAC") of 0.13%, above the 0.08% legal limit. Defendant was accordingly charged with a violation of N.J.S.A 39:4-50.

In a one-day hearing, the municipal court judge heard testimony from Officers LaManna and Barbini for the State, and from the cohabitant for the defense. In his oral decision, the municipal court judge upheld the propriety of the officers' actions and found the State had proven defendant's guilt.[2]

---

[1] As the municipal judge noted in his oral opinion, "[D]efendant failed them . . . [he] was unable to maintain his balance . . . [or]follow the instructions."

[2] A substantial amount of the trial concerned whether the SFSTs and the Alcotest had been properly administered, as well as whether defendant's BAC

A-3722-23

With respect to the police's second trip to the residence, the municipal judge found that "the officers, doing their community caretaking, drove out to the site, where they knew . . . there had been drinking earlier. And upon arriving, witnessed the defendant behind the wheel of a car that was running, with its lights on." [(Emphasis added).] The municipal judge further noted "[t]he officers . . . observed what they observed. . . . [C]learly, . . . [defendant] had operated the vehicle, that's without any doubt in the [c]ourt's mind, based on all the testimony . . ." Furthermore, the municipal judge expressed his satisfaction that, after the officers had administered the SFSTs, there "was sufficient probable cause to move forward . . . with the investigation." (Emphasis added).[3]

Based on his findings, the municipal judge concluded defendant was "guilty beyond any reasonable doubt of operating a motor vehicle . . . clearly under the influence of alcohol, with a reading of a .13, all admitted into evidence."

reading had been affected by an inhaler. Those testing issues have not been raised on appeal.

[3] Indeed, as we noted above, the municipal judge used the term "investigation" to refer to the police activities. Similarly, the Law Division judge used that terminology in stating that the police went back to defendant's residence at 3:08 a.m. in order to respond "to the scene to investigate." (Emphasis added).

In sentencing, the municipal judge imposed on defendant a seven-month license suspension with the option for an interlock device and twelve hours of Intoxicated Driver Resource Center training, plus the customary DWI surcharge, fines, court costs, and assessments.

Defendant appealed the municipal court's decision to the Law Division. At the trial de novo held on June 12, 2024, the Law Division judge made the following pertinent factual findings based on the record:

> [T]he two officers responded to the scene based on Sergeant Mariani's phone call observations . . . . and then the officers responded to the defendant's residence. They made observations of the defendant and believed that he was under the influence of an intoxicating liquor.
>
> Defendant stated that ultimately . . . he did drive a few blocks to pick-up [the cohabitant]. And that was certainly confirmed by [the cohabitant's] testimony.
>
> . . . .
>
> [T]he results [of the Alcotest] indicated the defendant's BAC was .13[%], certainly above the . . . legal limit of .08[%].

The Law Division judge rejected defendant's argument that there was no probable cause for the police to require him to submit to an Alcotest, finding it significant that "the officers [had] responded to the call at the residence of the defendant earlier that night and noted at that point that the defendant appeared intoxicated." Accordingly, the Law Division judge concluded that "the

6

observations of the field sobriety test . . . g[a]ve rise for probable cause to arrest . . . defendant under the influence of alcohol."

Notably for the purposes of the present appeal, the Law Division judge adopted the municipal judge's legal conclusion that the police encounter was justified by the community caretaking doctrine:

> [The municipal judge] . . . correctly noted the officers responded to the report of the defendant based on their functions as community . . . caretakers. Cady v. Dombrowski, 413 U.S. 433 [(1973)]. Certainly under the circumstances having previously observed the defendant only two to three hours prior to the motor vehicle stop under the influence of what they believed [to be] an intoxicating liquor, after responding to a 9-1-1 domestic violence call and clearing the scene, ultimately being informed that the defendant was operating the motor vehicle, they responded to the scene to investigate.

The Law Division judge further noted that "[a]fter arriving on the scene, . . . [Officer] LaManna saw the defendant sitting behind the wheel of the vehicle in question," and that it "was uncontroverted[] that the vehicle was running and the lights were on as the officer responded." The officers "subsequently observed the defendant at that point in time and certainly had reasonable suspicion that he was intoxicated."

Based on this evidence, the Law Division judge ruled that defendant had operated the motor vehicle and explained that this undisputed fact had been

A-3722-23

"confirmed . . . by the defendant's own statement and the statement of [the cohabitant]." The judge further noted that "[t]he motor vehicle code defines [an] operator as a person who is in actual physical control of a vehicle," quoting N.J.S.A. 39:1-1, and that "courts have interpreted operation broadly," citing State v. Thompson, 462 N.J. Super. 370 (App. Div. 2020) and State v. Ebert, 377 N.J. Super. 1 (App. Div. 2005). Under this "pragmatic and flexible interpretation of operation," as the Law Division judge noted, "the State does not necessarily have to prove that the vehicle was in motion or even that the engine was running . . . in order to satisfy the element of the DWI statute," citing State v. Mulcahy, 107 N.J. 467 (1987).[4]

The Law Division judge concluded "it is clear that the defendant, pursuant to our statutes, w[as] operating a motor vehicle pursuant to N.J.S.A. 39:4-50." The judge acknowledged that the officers' prior observations and "knowledge . . . [obtained] approximately two to three hours before the motor vehicle stop" was indicative that defendant had been "under the influence." Although the court acknowledged that some of defendant's symptoms were "consistent with an individual who had recently awakened," it ultimately found that this did "not

---

[4] Defendant does not dispute on appeal this finding of "operation" under N.J.S.A. 39:4-50.

explain the totality of the circumstances, specifically the odor of the alcoholic beverage emanating" from defendant, or defendant's "swaying" and "inability to stand."

Accordingly, the Law Division judge specifically found that "reasonable suspicion existed at the time of the motor vehicle stop to conduct the field sobriety test." However, as we will discuss, the Law Division judge did <u>not</u> address whether the police had a constitutional justification to <u>make</u> the motor vehicle <u>stop</u>, apart from the alleged community caretaking function.[5]

Before us, defendant presents the following arguments in his appellate brief, which are confined to the legality of the motor vehicle stop:

> POINT I
>
> THE COMMUNITY CARETAKING DOCTRINE WAS INAPPLICABLE BECAUSE THE MOTOR VEHICLE STOP WAS TETHERED TO AN INVESTIGATORY PURPOSE.
>
> POINT II
>
> THE OFFICERS DID NOT HAVE REASONABLE SUSPICION TO CONDUCT THE MOTOR VEHICLE STOP (Not Raised Below).

---

[5] In the "Motor Vehicles and Traffic Regulation Act," N.J.S.A. 39:1-1, "stop" is defined as "'Stop,' when required, means complete cessation from movement." In the present context, we construe the term to encompass the officers' approach to, and apprehension of, the vehicle.

We evaluate these arguments guided by well-settled principles of appellate review. In general, we review a trial court's findings of fact and credibility assessments with deference, sustaining those findings when they are based upon substantial credible evidence in the record. See State v. Locurto, 157 N.J. 463, 471 (1999). However, "[i]n contrast to the deference . . . owe[d] to a trial court's factual and credibility findings, [an appellate court] review[s] a trial court's legal conclusions de novo." State v. Amang, 481 N.J. Super. 355, 374 (App. Div. 2025) (citing State v. S.S., 229 N.J. 360, 380 (2017)). A reviewing court is not compelled to adopt the trial court's "legal conclusions or interpretation of the legal consequences that flow from established facts." State v. Burns, 462 N.J. Super. 235, 243 (App. Div. 2020) (citing State v. Goodwin, 224 N.J. 102, 110 (2016)).

With these standards in mind, we turn to defendant's legal challenges to the motor vehicle stop. The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect citizens against unreasonable searches or seizures, subject to eleven "specific exceptions." State v. Hill, 115 N.J. 169, 173 (1989). Warrantless searches or seizures are presumptively invalid and are prohibited "'unless [they] fall[] within one of the recognized exceptions to the warrant requirement.'" State v. Wilson,

178 N.J. 7, 12 (2003) (quoting State v. Cooke, 163 N.J. 657, 664 (2000)).

As we noted above, the State relied here on the community caretaking doctrine to justify the officers' early-morning interaction with defendant and his vehicle at his residence. The "community caretaking" doctrine was first recognized by the United States Supreme Court in Cady v. Dombrowski, where the Court observed that "[l]ocal police officers . . . engage in what . . . may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. 433, 441 (1973) (emphasis added). If the elements of that doctrine are shown, the fruits of an ensuing search and seizure may be constitutionally admissible. Id. at 442; see also State v. Mellody, 479 N.J. Super. 90, 124-25 (App. Div. 2024).

Our Supreme Court has likewise recognized that a search or seizure does not require there to be a warrant under the community caretaking doctrine, with the exception resting upon the non-investigatory functions of police officers in safeguarding the public. See State v. Maryland, 167 N.J. 471, 482 (2001). "[P]olice officers provide 'a wide range of social services' outside of their traditional law enforcement and criminal investigatory roles." State v. Edmonds, 211 N.J. 117, 141 (2012) (quoting State v. Bogan, 200 N.J. 61, 72

(2009)). Based on "their community-caretaker role, police officers, who act in an objectively reasonable manner, may check on the welfare or safety of a citizen who appears in need of help on the roadway without securing a warrant or offending the Constitution." State v. Scriven, 226 N.J. 20, 38-39 (2016) (citing State v. Diloreto, 180 N.J. 264, 276 (2004)).

The Supreme Court has further emphasized that "the community caretaking responsibility must be a real one, and not a pretext to conduct an otherwise unlawful warrantless search" or investigation. Bogan, 200 N.J. at 77. "So long as the police had an independent basis . . . under the community caretaking exception that was not a pretext for carrying out an investigatory search," New Jersey courts will find the actions of the police to be lawful Id. In reviewing citizen-police encounters under the community caretaking exception, "courts . . . 'employ a standard of reasonableness to determine the lawfulness of [the] police conduct.'" Diloreto, 180 N.J. at 276 (internal citation omitted).

Based on our de novo review of the applications of the community caretaking doctrine by the municipal and Law Division judges in this case, we conclude, as a matter of law, that the doctrine does not justify the police officers' stop of defendant's idling Jeep parked outside of his residence. The officers'

testimony reflects that the police approached the Jeep based on a belief that defendant, who had been observed in an intoxicated condition at his house two or three hours earlier, may have been driving the Jeep in a similar condition when he was spotted on the road at or about 3:08 a.m. by Sergeant Mariani. The ensuing early-morning encounter at defendant's house was manifestly pursued to determine whether defendant had committed a DWI. As such, the stop was not "totally divorced" from a criminal or quasi-criminal investigation. Cady, 413 U.S. at 441. Here, the officers' exercise of their community caretaking function was not a "real one," nor was there an "independent basis" for returning to defendant's residence distinct from pursuing the DWI investigation. Bogan, 200 N.J. at 77.

We note in this regard that there is no evidence defendant was seen in his Jeep weaving, speeding, running a red light or stop sign, traveling in the wrong lane, or committing any other apparent traffic violation. The officers did not assert in their testimony that they were concerned about the welfare of defendant's cohabitant as a passenger in the Jeep, nor any other person. The purpose of the stop was clearly to investigate a possible DWI committed by defendant. The rationale and requirements of the community caretaking doctrine were not supported here. Hence, the fruits of the stop, including the

field sobriety and Alcotest results, should have been excluded. Cady, 413 U.S. at 442; see also Mellody, 479 N.J. Super. at 124-25.

Turning to the second question before us, the State cannot salvage the validity of the motor vehicle stop by now invoking a different exception to the warrant requirement. The State argues that the stop was justified as an "investigatory stop" under Terry v. Ohio, 392 U.S. 1, 21 (1968) and State v. Nishina, 175 N.J. 502, 510-11 (2003), contending the police had a reasonable, articulable suspicion that defendant had been driving under the influence. However, the State never invoked that exception in the municipal court when the record was developed. Although the municipal court and the Law Division judge found probable cause to proceed with an arrest after the failed field sobriety testing, neither judge made a finding of reasonable suspicion to conduct the motor vehicle stop that proceeded those events. Unfortunately, the courts skipped ahead in the chronology of events without the necessary constitutional analysis of the stop itself.

We are loathe to permit the State to belatedly identify a different legal basis for its arguments of constitutional validity after the case was tried. State v. Robinson, 200 N.J. 1, 20 (2009). We recognize the Law Division judge found that the police had probable cause to administer the SFSTs as well as the

Alcotest based on their observations of defendant and the surrounding circumstances. But that finding did not validate, nor even discuss, the constitutionality of the motor vehicle stop that preceded the testing.

Based on these legal conclusions, we reverse defendant's conviction. The matter is remanded to the Law Division for the entry of an implementing order. Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

15