**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4810-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TE'MON M. MOLLEY,
a/k/a TEMON M. MOLLEY,

    Defendant-Appellant.

_____

Submitted December 9, 2020 – Decided February 22, 2022

Before Judges Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 17-09-1991.

Jacobs & Barbone, PA, attorneys for appellant (Louis M. Barbone, on the brief).

Damon G. Tyner, Atlantic County Prosecutor, attorney for respondent (Melinda A. Harrigan, Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Following the denial of his suppression motion, defendant Te'Mon M. Molley pleaded guilty to first-degree possession with intent to distribute over five ounces of cocaine and heroin, N.J.S.A. 2C:35-5(b)(1), in exchange for a recommended ten-year prison term, including five years of parole ineligibility. Three months after the entry of his guilty plea, but before sentencing, defendant obtained new counsel and filed a motion to withdraw the plea, premised on the alleged ineffective assistance his first lawyer provided him in connection with his suppression motion. The trial court denied the motion without an evidentiary hearing, finding defendant could not establish ineffective assistance of counsel under the two-part Strickland[1] standard nor any entitlement to withdraw his plea under State v. Slater, 198 N.J. 145, 157 (2009).

Defendant appeals, raising two issues for our consideration:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION TO WITHDRAW HIS PLEA.

POINT II

DEFENDANT PROVED THAT COUNSEL'S REPRESENTATION ON [THE] MOTION TO

---

[1] Strickland v. Washington, 466 U.S. 668, 693-94 (1984).

SUPPRESS WAS CONSTITUTIONALLY DEFICIENT BY FAILURE TO INVESTIGATE, PRESENT AND PROFFER CRITICAL EVIDENCE THAT WOULD HAVE EVISCERATED THE STATE'S CLAIM OF REASONABLENESS ON THE WARRANTLESS SEARCH.

Finding no reversible error, we affirm.

Patrolman Ryan VanSyckle, a five-year veteran of the Pleasantville City Police Department assigned to the street crimes unit, was the only witness to testify at the suppression hearing. In his investigation report, VanSyckle stated that he and his partner, Patrolman Girard Tell, were patrolling in the area of a particular apartment complex when they "observed a black BMW 535i bearing North Carolina registration . . . with dark tinted side and rear windows parked facing west next to the wooden fencing that surrounds the dumpster located in the far northwest corner of the complex." VanSyckle wrote:

> It should be noted that this vehicle has bullet ricochets on the driver side from an unreported shooting that occurred on June 21, 2017 . . . which Officer Tell and I investigated. Additionally[,] this agency has received private citizen complaints in regards to suspected narcotic sales within the . . . apartment complex and specifically occurring next to the dumpster. As we pas[sed] by the vehicle in question, the brake lights illuminated and we observed it to be running and occupied. We then circled around and approached the vehicle to conduct a suspicious motor

3

vehicle stop. As we approached the rear of the vehicle, we observed a black male wearing a purple shirt with short hair and a beard exiting from the front passenger side compartment. We immediately recognized that male to be Tackeem Molley.

The report continued:

Once we exited, Tackeem Molley began to walk away and attempted to conceal an item within a yellow plastic bag under the left side of his shirt. I subsequently ordered Tackeem to stop and show me his hands. He did so without incident. As we were standing next to the open front passenger side door, Officer Tell advised he smelt the odor of raw marijuana emanating from inside the vehicle. At this time, I removed the yellow bag from Tackeem and placed him in handcuffs. Inside the open unsealed bag was a large amount of U.S. paper currency about the size of a brick, wrapped in rubber bands and black hair ties. A further search of the yellow plastic bag revealed suspected cocaine residue, as well as a small rubber band, commonly used to hold together packages of narcotics, based on my training and experience.

At the suppression hearing, VanSyckle testified he and Tell were in an unmarked, white Chevy Tahoe patrolling the parking lot of the apartment complex when they spotted a black BMW in a spot next to the dumpster. It was July 8, 2017, about 2:20 in the afternoon, and the officers were there because there'd been a number of complaints about hand-to-hand drug transactions occurring at all hours in the parking lot near that dumpster.

4

The officers immediately recognized the BMW as they drove past as the same car involved in a shooting incident a few weeks earlier the officers were investigating. The car had been hit with gunfire, and a ricochet mark was still visible on the driver's side. VanSyckle testified the officers circled back around the lot, intending to "conduct a suspicious vehicle stop in regards to that shooting." As they were two car lengths away from the BMW, which was legally parked with the engine running, nose into the curb, the officers saw a man get out of the front passenger seat and turn to look at them.

VanSyckle testified he and Tell immediately recognized the man as Tackeem Molley, a convicted drug dealer. VanSyckle claimed Tackeem recognized them as well and began to walk hurriedly away, tucking a bright yellow bag under his shirt.[2] The officers activated their emergency warning lights, got out of the car, and VanSyckle ordered Tackeem to stop and show his hands. When the prosecutor asked how Tackeem would have recognized him in an unmarked car, VanSyckle explained the white Tahoe was a well-known police vehicle, and when the two made eye contact through the Tahoe's

---

[2]  Because defendant and Tackeem Molley share the same last name, we hereafter refer to Tackeem Molley by his first name to distinguish him from his brother, intending no disrespect in doing so.

A-4810-18

windshield, Tackeem appeared startled, with a "deer-in-the-headlights" look, and his "demeanor changed immediately" as he tried to conceal the yellow bag.

Tackeem obeyed the order to stop, standing near the open passenger door. VanSyckle claimed that as the officers approached, both he and Tell smelled burnt marijuana "coming from his person," although he acknowledged it could have been coming from the car because Tackeem "was standing within five to six feet" from it. According to VanSyckle, he immediately grabbed the bag from Tackeem, and based on the marijuana smell, handcuffed him and placed the bag on the trunk. VanSyckle searched Tackeem, finding cash but no contraband, and placed him in the backseat of the Tahoe. In the bag, which was open, VanSyckle found $12,000 in cash wrapped in rubber bands and hair ties, and some white residue, which the officer suspected was cocaine.

Officer Tell meanwhile had defendant, Tackeem's brother, step out of the car and likewise handcuffed him and patted him down, finding cash but no contraband. VanSyckle testified that one of the brothers had over $600 on him and the other around $1,700. Given the odor of marijuana and the amount of cash in the brothers' possession, the officers called for a canine unit. Following the dog's positive indication of drugs near one of the backdoors, the officers searched the car, finding a black digital scale in the backseat, also with

6

white residue. In the trunk, the officers found a bag containing over seven ounces of cocaine, some packaged separately, and seven packages of heroin. At the station house, officers discovered an additional ounce of cocaine, a couple of grams of marijuana, presumably for personal use, and 127 individual packs of heroin in defendant's possession.

On cross-examination, the lawyers for the brothers inquired into the basis for the stop, the sequence of events, which of the officers had smelled the marijuana, whether it was raw or burnt and where exactly they had smelled it. In response to their questions, VanSyckle testified the officers had two reasons for looping back to the BMW — the shooting investigation and the car being parked with its engine running right where residents had complained about drug activity. The officer explained in his experience, shootings and drug dealing are often related, and people and cars that get shot at are often involved in the same sorts of crimes.

VanSyckle testified he couldn't see into the car because the rear and side windows were heavily tinted and thus didn't know that defendant or his brother were inside. He confirmed that neither was a suspect in the shooting. Asked whether he knew the owner of the BMW, VanSyckle testified the officers had looked up the registration at the time of the shooting, but he didn't remember

the owner's name.  According to VanSyckle, a canvass of the area where the shooting occurred had yielded no information, and he had not interviewed the registered owner between the time of the shooting and finding the car parked next to the dumpster.

On redirect, VanSyckle repeated the "reasons why [they] approached" the BMW, including "to make contact with who was in that vehicle . . . in regards to the shooting to further follow up with that investigation." According to VanSyckle, he and Tell had already decided they were "going to definitely check . . . out and investigate" the BMW before they saw Tackeem get out, "at least find out who was in that vehicle."  But "[a]s [they] were approaching prior to activating [their] lights, Tackeem exited the vehicle."

After hearing that testimony and the argument of counsel, the judge denied defendant's motion in a comprehensive written opinion.  The judge found the officers were patrolling the specific area of the stop in response to citizen complaints of drug trafficking when they spotted a car they recognized as having been involved in a recent shooting.  Their attention having been drawn to the car, they observed Tackeem, whom they knew to be a drug dealer, get out and look over at them.  Upon observing the officers, Tackeem appeared nervous and tried to "conceal a large item wrapped in a yellow bag under his

8

shirt." Based on the totality of those circumstances, the judge found the officers had reasonable and articulable suspicion to conduct an investigatory stop.

The judge was also satisfied the smell of burnt marijuana coming from Tackeem and the car he had just exited provided the officers probable cause to search defendant and his brother, as well as the yellow bag and the interior of the car. See State v. Vanderveer, 285 N.J. Super. 475, 479 (App. Div. 1995) (noting the smell of marijuana constitutes probable cause "that a criminal offense ha[s] been committed and that additional contraband might be present").[3] The smell of marijuana, the discovery of the cash, the canine sniff indicating the presence of drugs in the car, and the digital scale found in the backseat made the further search of the trunk permissible under State v. Witt, 223 N.J. 409, 447 (2015) (approving a warrantless search under the automobile

---

[3] The legalization of marijuana in New Jersey has obviously changed that. The New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act took effect on February 22, 2021. L. 2021, c. 16. The Act amended N.J.S.A. 2C:35-10, by providing "[t]he odor of marijuana or hashish, or burnt marijuana or hashish, shall not constitute reasonable articulable suspicion to initiate a search of a person to determine" if the person is in possession of an amount of either marijuana or hashish constituting the commission of a crime. N.J.S.A. 2C:35-10(a)(3)(b)(i); L. 2021, c. 16, § 56. The amended statute does not apply here because this search took place more than three years before its effective date.

exception when "police have probable cause to believe that the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous").

Following the denial of his motion for reconsideration and the entry of his guilty plea, defendant retained new counsel and moved to withdraw his plea based on the alleged ineffective assistance of his counsel in connection with the suppression motion. Specifically, defendant averred he told his first lawyer that his girlfriend's cousin Hector Olivo owned the black BMW, and that VanSyckle had stopped Olivo several times, harassed him and groundlessly searched his car for drugs, which were not present, because the BMW had an out-of-state license plate.

Defendant proffered the affidavit of his girlfriend and a summary of a recorded statement Olivo provided to new counsel's investigator in support of his motion. In the summary, Olivo claimed he lived in Georgia, but had stayed some months in Pleasantville with his mother prior to defendant's arrest in July 2017. According to Olivo, VanSyckle and Tell had stopped him approximately six times over those few months, resulting in four or five tickets for illegally tinted windows. Each time the officers had asked whether there were guns or drugs in the car, conducted a search and found nothing. Olivo

10

was sure VanSyckle knew he owned the BMW because, in addition to those stops, VanSyckle had stopped him again after the car was struck by a bullet while parked in front of Olivo's uncle's house. Olivo claimed he'd been out of town when the car was damaged, but VanSyckle informed him of what happened and accused him of having been in the area when the shooting occurred.

Defendant's girlfriend said in a statement incorporated into her affidavit that she told defendant's lawyer that when VanSyckle assisted her in retrieving her belongings from the BMW in impound, he asked her relation to Olivo and told her to tell "[her] cousin he better change his address or [VanSyckle] was going to make it his business to take all [Olivo's] vehicles until he does follow the law." She claimed VanSyckle "already knew the owner" of the BMW and "decided to pull it over . . . simply to [h]arass [her] cousin." She claimed VanSyckle "was wrong for the intentions he had when he noticed the vehicle and decided to proceed with the stop."

Defendant claimed his first lawyer told him before the suppression hearing "that all of that was irrelevant, and that the only important issue had to do with the search of the trunk." Defendant contended that because his lawyer failed to investigate VanSyckle's history with Olivo, she was unprepared to

effectively cross-examine him on his reasons for stopping the BMW, including "his lie" about not having had "contact information or interviews with the vehicle owner." In addition, he argued his lawyer should have requested the State produce the alleged complaints about drug activity at the apartment complex where he was arrested and cross-examined VanSyckle about the discrepancies between his report of the stop and his testimony, including the chronology of the stop, and the omission of the odor of marijuana or any eye contact with Tackeem and his startled reaction from the officer's report.

Defendant's motion was heard, and denied, by the same judge who presided over the suppression motion and took defendant's plea. Being careful to analyze defendant's claim of ineffective assistance separately from his Slater motion, see State v. O'Donnell, 435 N.J. Super. 351, 371 (App. Div. 2014), the judge found defendant could not prevail on either claim. Applying the two-prong Strickland standard, the judge found counsel's decision not to pursue the information of VanSyckle's history with Olivo was strategic because she deemed it irrelevant to defendant's suppression motion.

The judge found whether VanSyckle knew the identity of the owner of the BMW was irrelevant because the tinted windows made it impossible to see who was inside and "there was ample independent probable cause for the stop;

12

namely that the vehicle was part of an active shooting investigation, parked in the precise area where complaints of illegal CDS activity had been made." The judge concluded that "even if defense counsel had elicited that VanSyckle was aware who owned the BMW, that fact would not have undermined the basis for the stop."

The judge rejected defendant's claims that the differences between VanSyckle's report and his testimony were significant. As to the chronology, the judge noted the only difference between the report and VanSyckle's testimony was when Tackeem started to walk away once he was out of the car. The report stated it was after the officers got out of their car that "Tackeem Molley began to walk away and attempted to conceal an item within a yellow plastic bag under the left side of his shirt," while VanSyckle testified that as soon as Tackeem exited "he appeared to be in shock, bladed his body away and concealed the bag."

The judge found VanSyckle didn't specifically testify whether Tackeem concealed the bag before or after he was ordered to stop, and "[a]s such there is no real inconsistency between the report and the testimony." The judge noted VanSyckle's unequivocal testimony that the officers had already decided "to make an investigatory stop before they even saw Tackeem exit," and thus

"[h]is acting in a suspicious manner afterwards only strengthened their reasonable suspicion and further justified their decision to conduct a stop."

The judge also found counsel's decision "not to spend time and resources" obtaining citizen complaints of drug activity in the area, "which may have only reinforced the State's case" was "a valid strategic choice," especially as defendant offered no evidence "to suggest either officer had a history of falsifying reports to justify motor vehicle stops." Because the judge found none of defendant's suggested subjects for cross-examination of the officer would have undermined his valid basis for effecting the stop — seeing Tackeem, a known drug dealer, get out of the car parked in an area the police were patrolling based on complaints of drug transactions, and try to hide the yellow bag — and thus would not have changed the outcome of the suppression hearing, the judge concluded defendant could not establish prejudice under Strickland.

Turning to the Slater[4] factors, the judge concluded defendant had not asserted a colorable claim of innocence, his reason for wishing to withdraw his

---

[4] The four Slater factors are: "(1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of defendant's reasons for withdrawal; (3) the existence of a plea bargain; and (4) whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused." 198 N.J. at 157-58.

plea — the alleged ineffective assistance of his counsel — was unavailing; the plea was the product of a plea bargain, and the State was not required to establish prejudice in light of defendant's failure to offer proof of the other factors, see 198 N.J. at 162.  Accordingly, the judge denied defendant's motion, and he was sentenced three days later.  This appeal followed.

Because the viability of defendant's Slater motion rested on his ability to establish a prima facie case of ineffective assistance of counsel entitling him to an evidentiary hearing, we, like the trial judge, turn first to defendant's Strickland claim.  See Kimmelman v. Morrison, 477 U.S. 365, 375 (1986) (noting "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious" and there exists a reasonable probability the outcome would have been different without the excludable evidence); State v. Johnson, 365 N.J. Super. 27, 35 (App. Div. 2003) (same).  And because it is readily apparent that had defendant been successful on his motion to suppress the drugs, he would not have pleaded guilty to a charge the State couldn't prove, see State v. Nunez-Valdez, 200 N.J. 129, 142 (2009), we focus on the first Strickland prong.  See Johnson, 365 N.J.

15

Super. at 35 (focusing on "the performance component" because a successful suppression motion "would most likely have affected the outcome").

Like the trial judge, we reject defendant's claim that he established a prima facie case that his first lawyer incompetently litigated the suppression motion, albeit for different reasons from those expressed by the judge. See State v. Maples, 346 N.J. Super. 408, 417 (App. Div. 2002) (noting "we affirm or reverse judgments and orders, not reasons"). We agree with the judge that most of the differences between VanSyckle's written report and his testimony at the suppression hearing were insignificant, and note that most, like the discrepancy between whether the officers had smelled raw or burnt marijuana, were thoroughly explored by the brothers' lawyers.

We disagree, however, that the reason defendant claims his first lawyer provided for failing to investigate VanSyckle's history with Olivo — that it was irrelevant — which we assume for these purposes is correct, see State v. Fisher, 156 N.J. 494, 498-99 (1998), or the trial court's surmise for counsel's failure to obtain discovery of the complaints the department had received about drug transactions in the vicinity of the dumpster — that it was a waste of time and money to seek the State's production of items that could have strengthened its case — could be fairly characterized as strategic choices.

16

Counsel is duty-bound to make "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "[S]trategy decisions made after less than complete investigation are subject to closer scrutiny." State v. Savage, 120 N.J. 594, 617-18 (1990). Only when "counsel thoroughly investigates law and facts, considering all possible options, [is] his or her trial strategy . . . 'virtually unchallengable.'" Id. at 617 (quoting Strickland, 466 U.S. at 690).

Had defendant's first lawyer sought the State's production of any prior tickets issued to Olivo, police reports involving the BMW, and complaints of drug activity at the apartment complex, she may have uncovered information to support the report defendant had received from Olivo that defendant claimed he sought to assert at the suppression hearing — that VanSyckle and his partner knew who owned the BMW because they had been harassing Olivo over the past several months. That information would have supported what defendant claimed he told his counsel — that this stop had nothing to do with complaints of drug activity at the apartment complex but was simply another opportunity for VanSyckle and Tell to harass Olivo.

It is easy to imagine that had the information been favorable to the defense, and had VanSyckle been confronted on cross-examination with proof

17

the officers had repeatedly stopped the BMW over the past few months and groundlessly searched the car, or that the department had never received any complaints about drug activity at the apartment complex, the officer's credibility would certainly have been affected, see State v. Fritz, 105 N.J. 42, 65 (1987) (discussing the importance of impeachment evidence), perhaps shaking the court's confidence in the accuracy of his account about whether he smelled marijuana or the sequence of events leading up to the warrantless search, an always critical consideration in assessing its validity, see State v. Gamble, 218 N.J. 412, 427 (2014) (noting "circumstances of an encounter between a private citizen and police may evolve quickly, thereby progressing rapidly from a simple field inquiry to a search").

Defendant may have similarly been able to call the officer's credibility into question had Olivo been subpoenaed to appear at the suppression hearing, and testified VanSyckle and Tell had stopped his car several times and searched it without cause. In that regard, we note the only video the State admitted was of the dog sniff and subsequent search. There is no video in the record of the officers approaching the BMW or of the actual stop, and thus no video confirming VanSyckle's account that Tackeem got out of the car, saw the

18

officers and tried to hide the yellow bag — all before the officers activated their lights to initiate the stop.

But it is not enough for a defendant pressing an ineffective assistance claim to point to possibly fruitful lines of cross-examination a more thorough investigation might have allowed. The defendant must be able to establish what such an investigation would have revealed and how its absence prejudiced him. See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999) (noting when a defendant "claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed"). And he must do so with competent evidence. See State v. Porter, 216 N.J. 343, 353-55 (2013). This record lacks that competent evidence.

Although defendant presented a summary of a recorded statement from Olivo on his motion, there is no sworn statement from Olivo in the record. A defendant claiming his trial counsel inadequately investigated his case must assert the facts the investigation would have uncovered, "supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification." Porter, 216 N.J. at 355 (quoting Cummings, 321 N.J. Super. at 170). There is no affidavit or certification from Olivo in the record. And the affidavits from defendant and his girlfriend about

19

Olivo's history with VanSyckle consist of inadmissible hearsay on those points. Although the girlfriend's sworn statement also recounts a conversation she had with VanSyckle, that conversation occurred after the stop and was limited to VanSyckle asking who Olivo was to her, and why did she have his car, and him telling her to tell Olivo to change the registration of the BMW or risk having his cars seized.

Nothing about that conversation impugned VanSyckle's account of the stop, even the testimony that he couldn't remember the name of the BMW's registered owner. Nor did defendant proffer other competent evidence on his Slater motion that might have permitted an effective cross-examination of the officer, as for example, the traffic tickets Olivo claims he was issued. Those tickets, if indeed they existed, would have been competent evidence that could have been used to impeach VanSyckle's testimony. But defendant presented no proof of them on his motion to withdraw his plea, nor any proof that the Pleasantville Police Department had not received the complaints of drug transactions near the dumpster that VanSyckle mentioned in his report and testified to at the suppression hearing.

As we explained in Johnson, a defendant urging ineffective assistance on direct appeal for failure to mount an effective suppression motion must

20

A-4810-18

succeed in convincing us he has a potentially meritorious suppression motion on the existing record.  365 N.J. Super. at 34-35.  We cannot make that finding here because the report of what Olivo would say if called to testify is not competent evidence, and defendant did not muster any other relevant proofs — and thus any entitlement to an evidentiary hearing.  See State v. Marshall, 148 N.J. 89, 158 (1997) (noting an evidentiary hearing is not warranted if "the defendant's allegations are too vague, conclusory, or speculative").  Nevertheless, we would be remiss if we did not note certain misconceptions about the current state of the law of search and seizure apparent on this record.[5]

Van Syckle testified he and Tell circled back around the parking lot intending to conduct an investigatory or suspicious vehicle stop of the BMW for two reasons — the citizen complaints about drug activity near the dumpster where the BMW was lawfully parked, and because they wanted to make contact with the driver, whom they had not interviewed, to follow up on the shooting investigation.  The judge rejected defendant's claim that he could establish VanSyckle had testified falsely because Olivo's statement made clear

---

[5]  We hasten to add that one of the cases we note below was decided only weeks before the officers conducted this stop and another several months after the judge rendered his decision on defendant's motion to withdraw his plea.

VanSyckle had already interviewed him about the shooting, thereby "eviscerating" any reasonable basis for the stop. The judge found Olivo's statement would not have undermined the officer's testimony. According to the judge, whether VanSyckle knew Olivo owned the BMW was irrelevant because the officers had "independent probable cause for the stop; namely that the vehicle was part of an active investigation, parked in the precise area where complaints of illegal CDS activity had been made," which VanSyckle "was clear in his testimony . . . was the reason for the stop."

We disagree the officers had probable cause to conduct a de facto arrest of defendant and his brother or reasonable suspicion to conduct an investigatory detention of the BMW based only on the car having previously been hit by gunfire and being lawfully parked in an area where drug transactions had allegedly occurred. Those facts would only have permitted the officers to conduct a field inquiry, not an investigatory detention. See State v. Rosario, 229 N.J. 263, 274 (2017) (distinguishing the "more casual and conversational interactions with a person in a parked car" characterized as field inquiries from an investigative detention created by police "partially blocking in [the defendant's] car from the rear [and] activating the alley light to flood the area with light"); State v. Stampone, 341 N.J. Super. 247, 252

22

(App. Div. 2001) (noting an occupied car parked on a residential street in the afternoon with out-of-state plates in an area where a crime was committed a week or two earlier is not suspicious, and if the rule were different, "a significant portion of our urban population would be susceptible to constant police investigation"). We also disagree the officers could have lawfully made an "investigatory stop" of the BMW simply "to make contact with who was in that vehicle . . . in regards to the shooting" or to "conduct a suspicious vehicle stop in regards to that shooting." See State v. Alessi, 240 N.J. 501, 508, 518-23 (2020) (holding police may not pull over a driver for questioning in furtherance of an investigation without reasonable suspicion the driver had committed a crime or a traffic violation).

Those errors, however, do not change our decision, because the law is well-established that an officer's subjective intent for making a stop is irrelevant so long as there is an objectively reasonable basis for the action. See State v. O'Neal, 190 N.J. 601, 614 (2007) (noting "[a]lthough an officer may testify to his or her subjective intent, the crucial inquiry is whether the officer's conduct was objectively reasonable"). Although the location of the car and its involvement in the shooting would not have been a sufficient basis to conduct an investigatory detention of the BMW, the judge accepted

A-4810-18

VanSyckle's testimony that he saw Tackeem, a known drug dealer, get out of the car and try to hide the yellow bag while the officers were still two car lengths away and before they activated their lights initiating the stop. We agree those facts, in combination with the location of the car and its involvement in the shooting, were sufficient to permit the officers to conduct a Terry[6] stop of Tackeem and the BMW, given how near he was standing to its open front door. See State v. Pineiro, 181 N.J. 13, 20 (2004) (holding "an investigatory stop, sometimes referred to as a Terry stop, is valid 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" (quoting State v. Nishina, 175 N.J. 502, 510-11 (2003)) (footnote omitted)).

Defendant's colorable claim of innocence and his reason for wishing to withdraw his plea, the first two Slater factors, rested entirely on his contention that his first lawyer provided ineffective representation on the suppression motion, which we do not find defendant established any prima facie claim. Accordingly, we cannot find the judge abused his discretion in denying defendant's motion to withdraw his plea, even under the more liberal "interests of justice" standard applicable to motions made before sentencing. See R. 3:9-

---

[6] Terry v. Ohio, 392 U.S. 1 (1968).

3(e); <u>Slater</u>, 198 N.J. at 156.  Our ruling is without prejudice to a post-conviction relief proceeding.  <u>See</u> <u>State v. Preciose</u>, 129 N.J. 451, 460 (1992) (noting the appropriateness of deferring ineffective-assistance-of-counsel claims to post-conviction relief proceedings when such claims involve allegations and evidence outside the trial record).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4810-18