**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1423-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHALO ROBERTS,
a/k/a CHALOT ROBERTS,
CHATO ROBERTS,
CHATE R. ROBERT,
and ROLANDO ROBERTS,

     Defendant-Appellant.

_____

        Submitted May 31, 2022 – Decided July 5, 2022

        Before Judges Vernoia and Firko.

        On appeal from the Superior Court of New Jersey, Law
        Division, Essex County, Indictment Nos. 15-10-2282,
        16-04-1092, 16-07-2247 and 17-08-2074.

        Joseph E. Krakora, Public Defender, attorney for
        appellant (Morgan A. Birck, Assistant Deputy Public
        Defender, of counsel and on the brief).

        Theodore N. Stephens II, Acting Essex County
        Prosecutor, attorney for respondent (Emily M. M. Pirro,

Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Chalo Roberts appeals from an order denying his motion to suppress evidence, eighty-five decks of heroin seized from the waistband of his pants when he was frisked following a stop by Irvington police officers, and his conviction by a jury of possessory drug offenses based on the seized evidence. Defendant also claims he was not competent to stand trial and his due process rights were violated because the court proceeded to trial without ordering a psychiatric examination to test his competency. Defendant further appeals from his judgements of conviction on charges in four separate indictments unrelated to those for which he was convicted at trial, but to which he pleaded guilty following his trial pursuant to a plea agreement with the State. He also contends his aggregate twenty-year sentence should be reversed because the court failed to engage in a Yarbough[1] analysis when it imposed consecutive sentences. Based on our review of the record, the parties' arguments, and the applicable legal principles, we affirm in part, vacate in part, and remand for re-sentencing.

---

[1] State v. Yarbough, 100 N.J. 627, 643-45 (1985).

I.

On March 25, 2015, defendant was arrested after he was found in possession of heroin and cocaine. A grand jury returned a six-count indictment, I-15-10-2282, charging defendant with two counts of third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a); two counts of third-degree possession with intent to distribute CDS, N.J.S.A. 2C:35-5(a)(1); and two counts of third-degree possession with intent to distribute CDS in a school zone, N.J.S.A. 2C:35-7.[2]

Defendant filed a motion to suppress evidence, challenging the legality of the protective frisk that resulted in the discovery of eighty-five decks of heroin and thirteen vials of cocaine in the waistband of his pants. The evidence presented during the suppression hearing established that on the evening of March 25, 2015, as the sun was setting, Irvington Police Department Detective Barry Zepeda was on patrol in an unmarked police car, with the assistance of Captain Lester Wilson and Detective Andreas Lebron, who were in separate police cars nearby. The three officers were assigned to the department's

---

[2] At a pretrial conference, the court granted the State's request to dismiss one count of third-degree possession of CDS, one count of third-degree possession of CDS with intent to distribute; and one count third-degree possession of CDS with intent to distribute in a school zone. Those counts were based on defendant's alleged possession of cocaine.

A-1423-18

narcotics unit. At the time of the patrol, there had recently been "a spike of robberies and shootings in the area, as well as complaints from citizens of narcotics activity."

Zepeda noticed defendant walking quickly down the street, "looking around nervously[,]" in various directions "with his hands . . . either in his . . . pocket, or waistband." Zepeda perceived defendant's actions as "looking for the police, or scouting for the police." Defendant's back was to Zepeda as he walked down the street. Zepeda watched defendant cross the street, with his hands in his pocket or waistband, and approach a woman who was standing nearby on the front steps of a house. It did not appear to Zepeda that defendant and the woman knew each other, and Zepeda did not observe any communication between the woman and defendant. As defendant crossed the street, Zepeda began approaching defendant in his car.

As defendant neared this woman, Zepeda observed defendant remove his hand from his waistband or pocket and take out a black plastic bag. Zepeda testified that as defendant held it, the bag was "puffier [in] the middle," indicating to Zepeda that something was inside of it. Zepeda relayed his observations to Wilson and Lebron.

4

Zepeda testified he thought a robbery was about to occur, but also explained he believed a drug transaction was about to occur. He testified that he could not tell if there was a weapon inside the bag but believed it could have contained either narcotics or a weapon.

After watching defendant for roughly one-and-a-half minutes, Zepeda "advised the [other] units in the area" to come to his location, and, just as defendant reached the first step of the home, roughly five feet from where the woman was standing, Zepeda exited his vehicle with his gun drawn and identified himself to defendant as a police officer. Wilson arrived as Zepeda exited his vehicle, and similarly drew his weapon. Zepeda testified he did not feel he was under a "threat of harm" at the initiation of the stop, but he drew his gun because he did not know if the black bag contained a weapon. Wilson testified he believed he was under "threat of harm" at the time he exited his vehicle because of the high crime area, the position of their vehicles in relation to defendant, and defendant's reaching into his waistband.

In response to Zepeda's approach, defendant kept his back to Zepeda and "pulled [the bag] away from [Zepeda], so [Zepeda] couldn't see what it was." Zepeda ordered defendant to turn around and put his hands up, but defendant "had his back towards" Zepeda and "kept digging into his front" while looking

over his shoulder. Zepeda watched as defendant tried to shove the bag back into his waistband. Wilson similarly observed defendant attempt to conceal something in his waistband. Zepeda began to fear for his safety because he could not see what was in defendant's hands, and he believed defendant was trying to conceal whatever he was holding. After initially not complying with Zepeda's directive, defendant put his hands in the air and followed Zepeda's command to place his hands against a wall.

Zepeda began to pat down defendant, and defendant said, "I have drugs on me, officer[,]" just before Zepeda felt a bulge in defendant's waistband. Zepeda's seizure of the item which caused the bulge revealed the black bag Zepeda had seen earlier; it contained heroin and cocaine.

The court denied defendant's suppression motion, finding the State met its burden of justifying the warrantless stop. The court found Zepeda's testimony credible and determined the totality of the circumstances, including defendant's presence in a high-crime area and the recent complaints about narcotics trafficking, defendant's nervousness and suspicious actions, his holding out the black bag, and his attempts to shove the black bag back into his waistband provided sufficient requisite suspicion to support the stop and frisk that resulted in the discovery of the CDS.

A-1423-18

During various pretrial conferences conducted by the court subsequent to his indictment, defendant made statements to the court that he now argues demonstrated he was not competent to stand trial. Following nine separate court appearances during which he fully cooperated with the court and did not interrupt the proceedings, at an April 5, 2017 conference, defendant, for the first time requested to make a statement regarding an issue defense counsel had "raised . . . before [the court] in chambers."

In response to questioning from the court, defendant asserted he was not a United States citizen, despite acknowledging he was born in Newark in 1972 and attended Newark schools until the eleventh grade. The court asked defendant if he had ever been diagnosed with any learning disability or emotional disorder, to which defendant responded, "no." Defendant described the judge's function, stating the judge "[m]ake[s] the decision and stuff[,]" and said he understood who was seated to his left, "[t]he [p]rosecutor, based on criminal activity[,] something like that." Defendant acknowledged understanding who his counsel was and that his counsel's role was to represent him. He further acknowledged he was on trial "[f]or CDS." He also demonstrated a general understanding of what a criminal trial entailed and the jury's and prosecutor's roles at trial.

A-1423-18

Following this colloquy, the court allowed defendant to make his statement. Defendant proceeded to "reserve on all [his] priors . . . and natural rights" and his purported right "not to be compelled to perform under contract or commercial agreement." He cited the Uniform Commercial Code and told the court he did "not have any contract with . . . your corporation" and was "unaware of any such contract which obligates [him] to perform." He insisted that he, "Chalo Roberts . . . L.B. . . . should not be misconstrued as the personal—person, Chalo Roberts . . . which is a legal fiction created without . . . [his] knowledge or consent." He asserted that by making his statement, he was "reserving [his] rights" and "amending [his] birth certificate."

The court observed "[t]hat makes no sense," explained the Uniform Commercial Code had no application in a criminal trial, and stated a criminal court was not the appropriate venue to modify a legal name or citizenship status. The court found defendant's assertions to be "simply a delay tactic" and noted it was "very clear" defendant knew why he was before the court. Defendant attempted to interrupt the court, making a statement regarding the Constitution, jurisdiction, and "colorable law." The court asked if defendant had gone to law school, and defendant explained he was "going to the law library . . . based on [his] case." The court concluded, "if you're . . . going to the law

8

library . . . because you understand that you're charged with a criminal offense, then I presume that you're in a position to communicate effectively with your lawyer and to assist in that defense."

The court permitted defendant to make an application. Defendant stated, "pursuant to the Rule 3[:]10-2" he sought to raise the court's purported lack of jurisdiction "by motion before trial." He also requested a trial postponement to allow him time to "prepare legal arguments, grounds, [and] motions" based on the court's purported "lack of jurisdiction." The court denied defendant's application.

The court asked defendant if he had any prior convictions by way of guilty plea in Superior Court for violations of the "[C]ontrolled [D]anger[ous] [S]ubstance[s] [A]ct," and defendant conceded he had previously pleaded guilty to such offenses. The court stated defendant therefore "acknowledge[d] the jurisdiction of the Superior Court of the State of New Jersey to address issues related to violations of the "Controlled [Dangerous] Substances Act." In response, defendant asserted his previous convictions had been "copout plea[s]" and claimed he "never knew about a lack of jurisdiction" at the time of those pleas. The court asked defendant what jurisdiction means, and when defendant failed to define the term, the court provided a concise definition, explaining it is

9

"[t]he power to hear certain types of cases involving certain types of individuals." The court rejected defendant's claim it lacked jurisdiction and denied his request for an adjournment of the trial.

At an April 18, 2017 pretrial conference before a different judge, the court again permitted defendant to make a statement. Defendant represented that he had placed a lien against the judge, and he sought to have the case dismissed on jurisdictional grounds. He asserted he was not under the court's jurisdiction, the court had a conflict of interest, and he was "certified under the Urban State." Alternatively, he sought to file an interlocutory appeal.

As the State responded to his statement, defendant attempted to interrupt. When he was permitted to respond to the State's argument that the court had already rejected defendant's jurisdictional arguments, defendant reasserted he was "certified[,]" and the court lacked jurisdiction. He also threatened to "put a lien . . . against" any judge hearing the case should it be transferred. The State argued defendant was attempting to delay the proceedings and it requested the case go forward. Defendant responded he was "a[n] Urban State certified officer," he had "power of attorney[,]" and should the court "deny [his] rights" he would "get a civil suit for the inconvenience that [he was] going through." The court explained it had jurisdiction over defendant's case.

Defense counsel stated he had previously raised the issue of defendant's competence to stand trial, claimed there was a basis for "legitimate concerns about [defendant's] ability to understand [the c]ourt's jurisdiction over him," and, noting defendant's statements, raised the issue of defendant's competency for the court's consideration.

The court attempted to question defendant about where he was and who was seated beside him, but defendant refused to answer. In response to the court's questioning, defendant alternatively stated he did not know the answer, reasserted the court lacked jurisdiction, and explained he would like to remain silent so as not to interfere with his jurisdiction argument. The court found defendant was "malingering . . . [a]nd attempting to . . . prevent this trial from going forward."

Defense counsel reasserted his concerns about defendant's competence. Because the court believed defendant was "purposely not answering [its] questions," the court reviewed the proceedings from the previous conference conducted by the earlier judge for the purpose of hearing defendant's responses to the questions previously asked of him. The court found defendant had satisfactorily answered the court's questions regarding his competency at the previous conference and found that "two weeks later" defendant was engaging

11

in a "tactic . . . to delay" or "straightforward malingering." The court concluded defendant was competent and capable of effectively assisting his attorney.

At an April 26, 2017 pretrial conference, the court addressed defendant's failed attempt to file an interlocutory appeal. Defense counsel said he explained his role as counsel to defendant, and defendant nonetheless pursued the motion for leave to appeal on his own. The court noted that, in addition to the interlocutory appeal, defendant had apparently filed a lien against the judge. The court determined defendant's use of the law library, and his filing of "the appeal papers and lien papers," mooted defense counsel's argument that defendant could not assist in his own defense. Defense counsel did not thereafter reassert any purported concerns about defendant's competency.

The case proceeded to trial before a jury, which found defendant guilty of possession of CDS, heroin, and possession with intent to distribute heroin charges under Indictment 15-10-2282. The jury acquitted defendant of possession with intent to distribute CDS in a school zone.

Prior to defendant's trial on the charges in Indictment 15-10-2282, he was charged with numerous other offenses in four separate additional indictments. Following his conviction by the jury of the two charges in Indictment 15-10-2282, defendant pleaded guilty, pursuant to a negotiated plea agreement, to

12

offenses charged in three of those indictments. More particularly, defendant pleaded guilty to: two counts of third-degree possession with intent to distribute CDS in a school zone, N.J.S.A. 2C:35-7(a), under Indictment 16-04-1092, arising from offenses committed on February 22, 2016; second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1), and third-degree hindering, N.J.S.A. 2C:29-3(b)(4), under Indictment 16-07-2247, arising from offenses committed on January 31, 2016; and third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1), under Indictment 17-08-2074, arising from an offense committed on February 3, 2017. In exchange for defendant's pleas to those charges, the State agreed to dismiss the charge in the remaining indictment, I-16-07-2248.

Under the plea agreement, the State agreed to recommend a ten-year custodial term with a five-year period of parole ineligibility on defendant's convictions under Indictment 16-07-2247, a concurrent five-year term with a three-year period of parole ineligibility on the charges under Indictment 16-04-1092, and a concurrent three-year term for defendant's conviction of the charge in Indictment 17-08-2074. The State also agreed to recommend the sentences imposed on the charges to which he pleaded guilty run consecutive to the

13

sentence to be imposed by the court on the charges for which the jury found him guilty after trial under Indictment 15-10-2282.

During a single proceeding, the court sentenced defendant on the charges to which he pleaded guilty and those for which the jury found him guilty. Defendant's trial counsel and plea counsel appeared on his behalf.[3] Counsel did not identify any statutory mitigating factors, but defendant's plea counsel asserted defendant had "lived a really tough life" and requested the court consider that a "non[-]statutory mitigating factor[]." The court found no mitigating factors.

The court reviewed defendant's criminal history, noting the "present cases represent[ed] [defendant's] eleventh, twelfth, thirteenth, and fourteenth indictable convictions." The court found: aggravating factor three, N.J.S.A. 2C:44-1(a)(3), "[t]he risk that the defendant will commit another offense"; aggravating factor six, N.J.S.A. 2C:44-1(a)(6), "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted"; and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), "[t]he

---

[3] Defendant had different counsel in the matter stemming from his March 25, 2015 arrest which proceeded to trial under Indictment 15-10-2282, than the counsel who represented him on the subsequent four indictments under which defendant pleaded guilty pursuant to his plea agreement.

need for deterring the defendant and others from violating the law," all based on defendant's "prior substantial record."

The court merged defendant's conviction for possession of CDS with his conviction for possession with intent to distribute CDS under Indictment 15-10-2282, granted the State's request for an extended term sentence on defendant's conviction for possession of intent to distribute CDS, and sentenced defendant to a ten-year custodial term with a five-year period of parole ineligibility on the charge.

On the charges for which defendant pleaded guilty, the court imposed: a ten-year prison term with a five-year period of parole ineligibility for his conviction for second-degree unlawful possession of a weapon under Indictment 16-7-2247; five-year prison terms with three-year periods of parole ineligibility for each of his convictions under Indictment 16-5-1092 for possession with the intent to distribute CDS within a school zone; and five-year prison terms for his convictions for third-degree hindering under Indictment 16-7-2247, and third-degree possession of CDS under Indictment 17-8-2074. The court dismissed the charge in Indictment 16-07-2248.

The court ordered that the sentences imposed on the charges to which defendant pleaded guilty would run concurrently with each other, and those

sentences would run consecutively to the aggregate ten-year term imposed on charges for which defendant was convicted by the jury. In sum, the court imposed an aggregate twenty-year custodial term with a ten-year period of parole ineligibility on all the charges. This appeal followed.

On appeal, defendant presents the following arguments for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BECAUSE THE POLICE DID NOT HAVE THE REQUISITE REASONABLE SUSPICION TO CONDUCT AN INVESTIGATORY STOP NOR DID THEY HAVE THE REQUISITE REASONABLE SUSPICION TO FRISK DEFENDANT. U.S. CONST., AMENDS. IV, XIV; N.J. CONST., ART. 1, PARA. 7.

A. There Was No Reasonable, Articulable Suspicion To Stop Defendant.

B. There Was No Reasonable, Articulable Suspicion That Defendant Was Armed And Dangerous To Support A Frisk.

POINT II

THE COURT VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS IN FINDING HIM COMPETENT BECAUSE BOTH THE STATE AND THE COURT FAILED TO REQUEST A PSYCHIATRIC EXAMINATION AND THE STAT[]E FAILED TO

16

OTHERWISE PROVIDE SUFFICIENT PROOF. U.S. Const., Amend. XIV, N.J. Const., Art. 1, paras. 1, 9, 10.

POINT III

BECAUSE THE SENTENCING JUDGE ENGAGED IN NO YARBOUGH ANALYSIS WHEN SENTENCING DEFENDANT TO CONSECUTIVE SENTENCES, THIS COURT SHOULD REMAND FOR A RESENTENCING.

II.

Defendant first argues the court erred by denying his motion to suppress the evidence seized from his waistband on March 25, 2015. He contends the State failed to present evidence establishing the reasonable suspicion required to support the investigatory stop and pat down that led to the discovery of the drugs in his possession. Defendant claims his presence in a high-crime area and Zepeda's observations of his conduct were insufficient to justify the investigatory stop, which led to the pat down and seizure of the evidence. Defendant further argues that even if there was sufficient reasonable suspicion to support the investigatory stop, the State's evidence did not establish proper justification for the pat down.

In our review of a court's denial of a motion to suppress evidence, "our scope of review . . . is limited." State v. Ahmad, 246 N.J. 592, 609 (2021). We "must uphold the factual findings underlying the trial court's decision so long as

17

those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192 N.J. 224, 243 (2007)). The court's factual findings must be given deference and should only be set aside when they are "clearly mistaken." State v. Zalcberg, 232 N.J. 335, 344 (2018) (quoting State v. Hubbard, 222 N.J. 249, 262-63 (2015)). We owe no such deference to a trial court's legal interpretations, which we review de novo. State v. Hathaway, 222 N.J. 453, 467 (2015).

A police encounter constitutes an investigatory stop "when 'an objectively reasonable person' would feel 'that his or her right to move has been restricted.'" State v. Rosario, 229 N.J. 263, 272 (2017) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). "An investigatory stop is constitutionally lawful 'if it is based on "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion of criminal activity.'" State v. Legette, 227 N.J. 460, 472 (2017) (quoting Rodriguez, 172 N.J. at 126). Where an investigatory stop "is premised on less than reasonable and articulable suspicion [it] is an 'unlawful seizure,' and evidence discovered during the course of an unconstitutional detention is subject to the exclusionary rule." Elders, 192 N.J. at 247.

"[R]easonable suspicion is neither easily defined nor 'readily, or even usefully, reduced to a neat set of legal rules.'"  State v. Stovall, 170 N.J. 346, 356 (2002) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  The Court has "explained that reasonable suspicion requires 'some minimal level of objective justification for making the stop.'"  State v. Birkenmeier, 185 N.J. 552, 562 (2006) (quoting State v. Nishina, 175 N.J. 502, 511 (2003)).  Consideration of the reasonable suspicion standard is "highly fact sensitive."  Nishina, 175 N.J. at 511.

In determining the propriety of an investigatory stop, we must consider the "totality of the circumstances"—that is, whether the facts observed by a police officer "in 'view of the officer's experience and knowledge, taken together with rational inferences drawn from those facts,'" gave rise to a reasonable and articulable suspicion of criminal activity.  Stovall, 170 N.J. at 361.  In conducting this analysis, "[f]acts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate, so long as the officer maintains an objectively reasonable belief that the collective circumstances are consistent with criminal conduct." Nishina, 175 N.J. at 511.

A-1423-18

"No mathematical formula exists for deciding whether the totality of circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity." Stovall, 170 N.J. at 361 (quoting State v. Davis, 104 N.J. 490, 505 (1986)). In determining whether a police officer possessed reasonable and articulable suspicion, a court may "consider[] the officers' background and training, and permit[] them 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."'" State v. Nelson, 237 N.J. 540, 555 (2019) (quoting United States v. Arvizu, 534 U.S. 266, 273, (2002)). However, for a court to find reasonable and articulable suspicion existed, "a police officer must 'be able to articulate something more than an "inchoate and unparticularized suspicion or hunch."'" Stovall, 170 N.J. at 357 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

A.

Contrary to defendant's assertion that "there was an absence of factors" to establish a reasonable and articulable suspicion, Zepeda testified to various circumstances that, considered in their totality, established reasonable and articulable suspicion to conduct the investigatory stop of defendant.

Specifically, Zepeda was a thirteen-year veteran of the Irvington Police Department with training in "narcotics trafficking[,]"and he had previously made arrests in the area of the stop for narcotics and weapons possession. State v. Citarella, 154 N.J. 272, 280-81 (1998) (finding an investigatory stop justified in part by officer's knowledge bicycles were used to transport drugs in that area); State v. Arthur, 149 N.J. 1, 9-10 (1997) (finding an investigatory stop justified in part based on officer's experience and expertise). The court found Zepeda testified credibly and therefore the facts derived from his testimony are considered deferentially. State v. Gamble, 218 N.J. 412, 425 (2014).

Zepeda explained he was patrolling in the area because it had recently seen "a spike [in] robberies and shootings" and "complaints from citizens of narcotics activity." State v. Pineiro, 181 N.J. 13, 26 (2004) (recognizing "the reputation or history of an area and officer's experience with and knowledge of the suspected transfer of narcotics" to be "relevant factors to determine the validity of an" investigatory stop); Citarella, 154 N.J. at 280-81 (noting a "rash of burglaries in the area" was a factor warranting consideration); Arthur, 149 N.J. 1, 9-10 (recognizing a defendant's presence in "an area known for high levels of narcotics activity" as a relevant factor); State v. Bard, 445 N.J. Super. 145, 158 (App. Div. 2016) (considering officer's "personal knowledge of the

numerous violent crimes occurring in the neighborhood" as well as the officer's "training and experience" among the totality of the circumstances); State v. Morrison, 322 N.J. Super. 147, 154 (App. Div. 1999) (noting officer's awareness that a location was a "very high narcotics area" and recent complaints from citizens regarding narcotics transactions were relevant factors). Zepeda also testified that at the time he observed defendant, the sun was setting. Bard, 445 N.J. Super. at 158 (recognizing "hour of day" and "lack of lighting" are relevant factors); State v. Butler, 278 N.J. Super. 93, 104 (App. Div. 1994) (recognizing lateness of the hour as a relevant factor).

Zepeda first noticed defendant because defendant was nervously looking around in all directions, in a manner suggesting he was "looking for . . . or scouting for the police." State v. Privott, 203 N.J. 16, 29 (2010) (noting a defendant's nervousness as a relevant factor); State v. Mann, 203 N.J. 328, 339-40 (2010) (recognizing a defendant's nervousness as a relevant factor when combined with other facts); Stovall, 170 N.J. at 367 (noting "the well-established rule that a suspect's nervousness plays a role in determining whether reasonable suspicion exists" and collecting cases for that proposition). Zepeda observed defendant's scanning of the area as he traveled along the sidewalk and noted it was not confined to, or related to any effort to, cross the street. Zepeda

also observed defendant nervously make gestures towards, and reach towards, the waistband of his pants as he traveled up the street. Privott, 203 N.J. at 29 (noting a defendant's reaching to his waistband as a relevant factor as this is "an area commonly used by armed persons to conceal a weapon").

As defendant proceeded down and then across the street, Zepeda observed defendant traveling in the direction of a woman standing on the steps outside of a house who did not exhibit any signs of knowing defendant and to whom Zepeda did not observe defendant speak. When defendant "first turned onto the steps" of the house where the woman stood and was "maybe five feet" from the woman, Zepeda noticed defendant remove his hand from his pocket or waistband and produce a black bag. Upon seeing defendant produce this black bag, and noticing it contained something—because "it was puffier[ in] the middle"—based on Zepeda's "training and experience" he believed the bag could have contained "either narcotics or a weapon." Zepeda testified that based on his observations and the other extant circumstances, he believed either "a robbery" or "drug transaction was about to occur."

"[T]he reasonableness of police conduct is assessed with regard to circumstances facing the officers, who must make split second decisions in a fluid situation." Bard, 445 N.J. Super. at 157. It is also "important for courts to

A-1423-18

take a realistic approach to 'reviewing police behavior in the context of the ever-increasing violence in society.'" Ibid. (quoting State v. Valentine, 134 N.J. 536, 545 (1994)).

It was only after defendant produced this bag from his waistband or pockets and came within an "arm's-length of" the woman, that Zepeda exited his vehicle, and he and Wilson conducted the investigatory stop. Although Zepeda could not conclusively determine whether defendant attempted a potential drug transaction or posed a risk to the woman who did not appear to recognize defendant, we are satisfied there was a reasonable and articulable suspicion for the officers to conduct the investigatory stop.

Defendant urges that we consider many of the circumstances in isolation and he posits innocent explanations for the various observations made by Zepeda. However, "[e]ven if all of the factors were susceptible of purely innocent explanations, a group of innocent circumstances in the aggregate can support a finding of reasonable suspicion." State v. Dunbar, 434 N.J. Super. 522, 527 (App. Div. 2014) (quoting Stovall, 170 N.J. at 368); Birkenmeier, 185 N.J. at 562 ("Facts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate" (quoting Nishina, 175 N.J. at 511)). "[S]imply because a defendant's actions

might have some speculative innocent explanation does not mean that they cannot support articulable suspicions if a reasonable person would find the actions are consistent with guilt. Arthur, 149 N.J. at 11; Mann, 203 N.J. at 338 ("[T]he fact that a suspect's behavior may be consistent with innocent behavior does not control the analysis.").

Defendant correctly states his mere presence alone in a high-crime area does not justify an investigatory stop, see State v. Chisum, 236 N.J. 530, 549 (2019) ("[J]ust because a location to which police officers are dispatched is a high-crime area, 'does not mean that the residents in that area have lesser constitutional protection from random stops'" (quoting State v. Shaw, 213 N.J. 398, 420 (2012))), but he ignores the totality of the circumstances—including his presence at nightfall in a high-crime area with recent incidents of violence and complaints about drug trafficking, his quick movement up the street accompanied by his nervous glances to places around him that were unnecessary to aid his direction of travel, the frequent movement of his hands towards the waistband of his pants, his quick movement directly toward a woman who showed no signs of knowing him, defendant's reach into the area of his waistband and retrieval of a black bag, and defendant's extension of his hand with the bag directly at the woman as he got very close to her—informed

Zepeda's reasonable and articulable suspicion defendant might be engaged in either a drug transaction or the commission of a crime against the woman. Although the Court has instructed presence in a high-crime area alone is not sufficient to justify a warrantless detention, the Court nonetheless has recognized "police officers should consider their surroundings" in determining whether reasonable and articulable suspicion exists. Ibid. That is precisely what Zepeda, assisted by the other officers, did here.

We find defendant's attempt to isolate each circumstance presented to Zepeda unavailing, and we are convinced the court did not err by finding that the totality of the circumstances, during the quickly unfolding events presented, supported a reasonable and articulable suspicion defendant was engaged in criminal activity, or about to engage in criminal activity, when the officers conducted the investigatory stop.

B.

Defendant next claims that even if Zepeda had reasonable articulable suspicion to stop defendant, Zepeda did not possess the reasonable suspicion required to conduct a protective frisk. Defendant suggests a protective frisk is only appropriate where a suspect is suspected of a violent crime, or where

26

officers have received a tip that a suspect is presently armed. He contends that any concern Zepeda had for his safety was not reasonable.

In the seminal case addressing the lawfulness of a protective frisk, Terry v. Ohio, 392 U.S. 1, 24 (1968), the United States Supreme Court recognized the importance of protecting the safety of police and the public, and explained, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others" it would be "clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." In discussing the "landmark case of Terry" our Supreme Court has "emphasize[d] the need for a realistic State approach to the dangers presented by the modern proliferation of handguns in the possession of millions of citizens including, of course, many violent criminals." In re H.B., 75 N.J. 243, 245 (1977).

A protective frisk allows "a law enforcement officer 'to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm'"; specifically, an officer "may conduct 'a carefully limited search of the outer clothing . . . in an attempt to discover

weapons which might be used to assault him.'" State v. Roach, 172 N.J. 19, 27 (2002) (quoting Terry, 392 U.S. at 23, 30).

Contrary to defendant's claim Zepeda's uncertainty about whether defendant was about to commit a violent crime rendered the protective frisk impermissible, an "officer need not be absolutely certain that the individual is armed" to conduct a protective frisk. Valentine, 134 N.J. at 543 (quoting Terry, 392 U.S. at 27). Rather, "the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." Ibid. (quoting Terry, 392 U.S. at 27).

"[A]n objective test" is applied "in determining whether, under the totality of the circumstances, a police officer's actions in conducting a Terry frisk are reasonable." Privott, 203 N.J. at 30. The Court has recognized "[v]arious circumstances may give rise to an objectively reasonable suspicion that a suspect is armed and dangerous." Ibid. (alteration in original) (quoting State v. Thomas, 110 N.J. 673, 679 (1988)). "Indeed, the same conduct that justifies an investigatory stop may also present the officer with a specific and particularized reason to believe that the suspect is armed." Ibid. We observe that in deciding whether to conduct a protective frisk, "law-enforcement officers must make instantaneous decisions about whether a frisk for weapons is justifiable[,]" that

this "task is an unenviable one often fraught with life-and-death consequences[,]" and "[a]s the front line against violence, law-enforcement officers are particularly vulnerable to violence often becoming its victims." Valentine, 134 N.J. at 545.

Having concluded Zepeda was justified in conducting the investigatory stop of defendant, we add that defendant's "shoving" the black bag which Zepeda first observed defendant extend in the direction of the woman on the steps and then place "back into his waistband" while ignoring Zepeda's instructions to raise his hands, provided the reasonable and articulable suspicion necessary to conduct the protective frisk that ultimately yielded the discovery of the CDS. Although Zepeda testified he did not initially believe there was a "threat of harm" posed to him, he explained that he subsequently developed a concern for his own safety because defendant kept his back to him, defendant did not initially follow Zepeda's commands to raise his hands, Zepeda did not know whether the bag contained a weapon, and defendant tried "to conceal" the bag, and "would not show [Zepeda] his hands when he was being told to." Wilson similarly testified he perceived a "threat of harm" upon approaching defendant "[d]ue to the . . . high drug trafficking area" where there had been "several

29                                                                                      A-1423-18

homicides in a six[-]month period[,]" and due to defendant's "reaching in his waistband and turning away" rendering it unclear "if he had a weapon or not."

Our courts have held that a suspect's reaching into their waistband in response to a police encounter, in conjunction with other factors, justifies a protective, over-the-clothes frisk. Privott, 203 N.J. at 29-30; Bard, 445 N.J. Super. at 157-58 (finding in combination with other factors, an officer's protective frisk in response to a suspect ignoring an officer's command to show his hands and reaching his hands into his pocket was "not only objectively reasonable, but necessary to assure the [officer's] safety"); State v. Bellamy, 260 N.J. Super. 449, 457 (App. Div. 1992) (finding an officer observing a "driver's hand move toward his inside jacket pocket" causing the officer to "fear[] that [the driver] might have a weapon or something hidden in there" in light of the officer's experience and training, justified a protective frisk (second alteration in original)).

Based on the totality of the circumstances presented to the officers, we are convinced Zepeda was justified in conducting his protective frisk of defendant. Accordingly, we find no error in the court's denial of defendant's suppression motion.

## III.

Defendant next argues the court erred by failing to sua sponte order that he undergo a psychiatric examination based on his statements to the court during pretrial conferences. He claims his statements established "a 'bona fide doubt' as to his competence to stand trial." Defendant cites to the patently meritless legal claims concerning the court's jurisdiction and other issues that he presented, his interruptions of the pretrial conferences to assert his claims, and his "unintelligible" presentation of the claims in "run-on sentences . . . jumping from one topic to another, sometimes mid-sentence[.]" He argues the court's failure to order a psychiatric examination violated his due process rights. Defendant concedes he "may have had an adequate factual understanding," and he acknowledges "he articulated the elements of the criminal proceeding and the roles of the attorneys and judge[,]" but he nonetheless insists he did not "rationally underst[and] what was happening around him."

The Due Process Clause of the Fourteenth Amendment prohibits trial, conviction, and sentencing of mentally incompetent defendants. Pate v. Robinson, 383 U.S. 375, 378 (1966). A court's failure to invoke "procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial."

31

Drope v. Missouri, 420 U.S. 162, 172 (1975); see also State v. Purnell, 394 N.J.

Super. 28, 47 (App. Div. 2007); State v. M.J.K., 369 N.J. Super. 532, 547 (App.

Div. 2004).

Consistent with a defendant's due process rights, our Criminal Code

provides "[n]o person who lacks capacity to understand the proceedings against

him or to assist in his own defense shall be tried, convicted or sentenced for the

commission of an offense so long as such incapacity endures."  N.J.S.A. 2C:4-

4(a).  N.J.S.A. 2C:4-4(b) codifies the test for competence of a defendant to stand

trial on criminal charges:

> A person shall be considered mentally competent to
> stand trial on criminal charges if the proofs shall
> establish:
>
> (1) That the defendant has the mental capacity to
> appreciate his presence in relation to time, place and
> things; and
>
> (2) That his elementary mental processes are such that
> he comprehends:
>
> (a) That he is in a court of justice charged with a
> criminal offense;
>
> (b) That there is a judge on the bench;
>
> (c) That there is a prosecutor present who will try to
> convict him of a criminal charge;

(d) That he has a lawyer who will undertake to defend him against that charge;

(e) That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;

(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and

(g) That he has the ability to participate in an adequate presentation of his defense.

N.J.S.A. 2C:4-5(a) provides that "whenever there is reason to doubt the defendant's fitness to proceed, the court may on motion by the prosecutor, the defendant or on its own motion, appoint at least one qualified psychiatrist or licensed psychologist to examine and report upon the mental condition of the defendant." Here, although defense counsel raised concerns related to defendant's competency on two separate occasions before the two judges who presided over the pretrial conferences, when pressed by the court to clarify whether he was requesting a "mental evaluation," defense counsel declined to

33

affirmatively state he believed defendant was incompetent or request a psychiatric evaluation.

Where a defendant challenges a court's decision not to sua sponte order a psychiatric examination, or competency hearing under N.J.S.A. 2C:4-5(a), our standard of review "is a strict one." State v. Harris, 181 N.J. 391, 458 (2004) (quoting State v. Spivey, 65 N.J. 21, 37 (1974)). "[O]ur role in reviewing the decisions of a trial judge respecting competence [is] 'typically, and properly, highly deferential.'" M.J.K., 369 N.J. Super. at 548 (quoting State v. Moya, 329 N.J. Super. 499, 506 (App. Div. 2000)). The Court has recognized that "while [a trial] court has the power to order an inquiry in[to] the defendant's mental qualifications to stand trial, failure to exercise the powers will not be reviewed on appeal, unless it clearly and convincingly appears that the defendant was incapable of standing trial." Spivey, 65 N.J. at 37 (quoting State v. Lucas, 30 N.J. 37, 73-74 (1959)).

In the first instance, to obtain a competency hearing, the defendant bears the burden of establishing "a 'bona fide doubt' regarding a defendant's competency to stand trial." State v. Lambert, 275 N.J. Super. 125, 128 (App. Div. 1994). Only after a bona fide doubt as to a defendant's competency has been established, and a competency hearing ordered, does the burden shift to

"the State to establish competency to stand trial by a preponderance of the evidence." Id. at 129.

"The evidence necessary to establish the requisite bona fide doubt as to a defendant's competence is difficult to articulate . . . ." Ibid. "[T]here are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed.'" State v. Gorthy, 226 N.J. 516, 530 (2016) (quoting Drope, 420 U.S. at 180). The United States Supreme Court provided a helpful illustration of this threshold determination in Drope, where it explained, "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient." 420 U.S. at 180. However, the "'[m]ere suggestion' of incapacity is not sufficient," and a court is not required to conduct a competency hearing "in the absence of . . . substantial evidence of the existence of a degree of mental disorder which would unfit the defendant from conducting his cause or instructing his counsel." Spivey, 65 N.J. at 36-37 (quoting State v. Peacock, 50 N.J.L. 34, 36 (1887)).

Although a court is not required to accept counsel's representations regarding a defendant's competency, because "determination of this preliminary

question is within the inherent power of the court[,]" Lambert, 275 N.J. Super. at 129, "a lawyer's representations concerning the competence of [a] client, . . . is unquestionably a factor which should be considered[,]" Drope, 420 U.S. at 177 n.13.

Measured against these standards, we discern no basis to conclude the court erred by finding no need for a psychiatric evaluation to determine defendant's competence to stand trial. Preliminarily, defendant misconstrues the burdens of proof in arguing the State bore the threshold burden of establishing defendant's competency where defense counsel does not request a psychiatric evaluation and the court does not order a competency hearing. Defendant bore the initial burden of establishing a bona fide doubt as to his competency, and defendant fails to demonstrate there was clear and convincing evidence he was incompetent to stand trial, and the record before the court did not establish a bona fide doubt about defendant's competence to stand trial. See Spivey, 65 N.J. at 37.

In response to defendant's request to make a statement, and in reference to an "issue" defense counsel had raised with the court "in chambers," the court engaged defendant in a colloquy addressing the factors set forth in N.J.S.A. 2C:4-4(b). Although some of defendant's responses appear in the transcript as

"inaudible" or "no verbal response," we observe nothing in defendant's responses to the court's questioning suggesting incompetence to stand trial. Indeed, defendant concedes on appeal that his responses suggest a "factual understanding" of the proceedings.

Although at a subsequent pretrial hearing, with a different judge presiding, the court was unable to elicit responses to similar questions from defendant regarding his competency, there is no evidence that was because defendant was unable to understand the questions or lacked the capacity to provide answers. Instead, the lack of responses to the court's questions was the result of defendant's insistence the court had a conflict of interest, his continuous objections to the court's jurisdiction, and his assertion of his right to remain silent. His refusal to answer the court's questions was premised on defendant's concern a response would "interfere with [his] jurisdiction" argument.

There is no evidence defendant's recalcitrance and assertions of plainly incorrect legal arguments was the product of a psychological illness, learning disability, emotional disorder, or incompetence. Instead, defendant argues only that the court had reason to doubt his competence because he made meritless legal arguments, such as insisting the "person, Chalo Roberts" was "a legal fiction created without . . . [his] consent[,]" and that, under the Uniform

Commercial Code the court's jurisdiction rested on a contract he had not agreed to and could not be compelled to recognize.

Although defendant did not claim he was a sovereign citizen, the court adeptly recognized defendant's legal claims as those raised in the context of "a sovereign citizen issue." Similar claims asserted by those who subscribe to the sovereign citizen philosophy—challenging the court's jurisdiction, asserting the United States is a corporation, and asserting natural rights—have been uniformly rejected by courts.

The Ninth Circuit Court of Appeals addressed the same claim asserted by defendant—that his adherence to a belief that did not recognize the court's jurisdiction demonstrated a lack of competence to stand trial—in United States v. Neal, where it explained:

> It is not disputed that [the defendant] made numerous comments and filed a variety of documents disputing jurisdiction and other "nonsensical" issues (e.g., "[the] United States is a corporation . . . as a corporation it cannot interact with human beings"; "the sale of bonds based on Petitioners [sic] conviction by the court creates a financial conflict of interest".). However, [the defendant] also professed a "sovereign citizen" belief system. His comments and conduct were indicative of that belief, not a lack of competence. [The defendant] cannot now use those beliefs as an expression of incompetency. "In the absence of any mental illness or uncontrollable behavior, [the defendant] had the right

38

to present [his] unorthodox defenses and argue [his] theories to the bitter end."

[776 F.3d 645, 657 (9th Cir. 2015) (second, third, seventh and eighth alterations in original) (quoting United States v. Johnson, 610 F.3d 1138, 1147 (9th Cir. 2010)).]

Here, like in United States v. Coleman, 871 F.3d 470, 476 (6th Cir. 2017), "[d]efendant's legal arguments directly correspond to meritless rhetoric frequently espoused by tax protesters, sovereign citizens, and self-proclaimed Moorish-Americans." See ibid. (collecting cases addressing claims disputing jurisdiction premised on sovereign citizen and similar anti-government philosophies). In United States v. Brown, the First Circuit explained in a similar context that a proclaimed sovereign citizen's meritless legal arguments "did not evidence confusion on [the defendant's] part about the legal proceedings against him, but rather reflected firmly held, idiosyncratic political beliefs punctuated with a suspicion of the judiciary." 669 F.3d 10, 18 (1st Cir. 2012); see also United States v. DiMartino, 949 F.3d 67, 73 (2d Cir. 2020) ("agree[ing] with other circuits that have held political views derived from tax protester movements—however they appear to the uninitiated—are not, by themselves, sufficient evidence of mental incompetence"); United States v. James, 328 F.3d 953, 955-56 (7th Cir. 2003) (Explaining "[m]any litigants articulate beliefs that

have no legal support. . . . Sometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect so deficient that trial is impossible[,]" and reasoning "[o]ne person with a fantastic view may be suspected of delusions; two people with the identical view are just oddballs" (citations omitted)).

The arguments defendant proffered to the trial court, and upon which he relies to support his claim there was reason to doubt his competence, represent nothing more than an adherence to a nonsensical and baseless anti-government philosophy; they do not "clearly and convincingly" demonstrate incompetence. Spivey, 65 N.J. at 37. Indeed, part of defendant's strategy was to intimidate the court and interrupt the proceedings; he filed a pro se interlocutory appeal and filed a lien against the property of one of the judge's presiding over his pretrial conferences. Defendant also threatened to file liens against any judge to whom his case was transferred. These actions reflect the considered but ill-advised plan of an individual intent on disrupting the legal process. See Bey v. Stumpf, 825 F. Supp. 2d 537, 540-41 (D.N.J. 2011) (noting sovereign citizens often resort to "paper terrorism" which can involve the filing of "fraudulent liens" which are "easy to file" but "are very burdensome to remove").

40

Defendant stated as much. He advised the court he sought to have the trial "postponed" based on his claim the court lacked jurisdiction. Thus, the record supports the court's determination defendant's baseless legal arguments were not the product of a lack of competence; they were an attempt to delay his trial. We find no error in the court's determinations defendant was competent to stand trial.

## IV.

Defendant's final argument is that the court erred in failing to engage in an analysis of the factors detailed in Yarbough when it imposed consecutive ten-year custodial terms. 100 N.J. at 643-44. The State argues that where a defendant is sentenced in accordance with a plea agreement that explicitly calls for consecutive sentences for separate crimes, "no Yarbough analysis is required."

"[Our] review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We "employ the general shock-the-conscience standard for review of the exercise of sentencing discretion in the arena of consecutive-versus-concurrent sentencing." State v. Torres, 246 N.J. 246, 272 (2021). "[W]hen determining whether consecutive sentences are warranted," a sentencing court

is required "to perform the well-known assessment of specific criteria" set forth in Yarbough. State v. Randolph, 210 N.J. 330, 353 (2012). Specifically, Yarbough requires consideration of "the following criteria:"

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous;
>
> (4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense;

[100 N.J. at 643-44.]

"In addition, in determining whether the terms should be concurrent or consecutive, the focus of the court should be on the fairness of the overall sentence." State v. Sutton, 132 N.J. 471, 485 (1993); see State v. Abdullah, 184 N.J. 497, 515 (2005).

A sentencing court is required to "separately state the reasons for imposing a consecutive sentence" under the guidelines established in Yarbough. State v. Marinez, 370 N.J. Super. 49, 59 (App. Div. 2004). "An explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings, is essential to a proper Yarbough sentencing assessment." Torres, 246 N.J. at 268. "When a trial court fails to give proper reasons for imposing consecutive sentences at a single sentencing proceeding, ordinarily a remand should be required for resentencing." State v. Carey, 168 N.J. 413, 424 (2001).

The State suggests that we exercise our discretion and affirm defendant's sentence as we did in State v. Soto, where we affirmed a consecutive sentence in the absence of the requisite findings by the trial court under Yarbough because

"'the facts and circumstances [left] little doubt as to the propriety of the sentences,' and the sentences [were] not shown to be 'clearly mistaken,'" 385 N.J. Super. 247, 257 (App. Div. 2006) (quoting State v. Jang, 359 N.J. Super. 85, 97-98 (App. Div. 2003)),

We also noted the consecutive sentences were imposed in accordance with the defendant's plea agreement and we explained that the reasons for the trial court's imposition of consecutive sentences "were self-evident"—the "separate crimes [were] committed on separate occasions and the plea agreement itself called for consecutive sentences." Ibid. The State also directs our attention to N.J.S.A. 2C:44-5(h), which states that "when a defendant is sentenced to imprisonment for an offense committed while released . . . pending disposition of a previous offense, the term of imprisonment shall run consecutively to any sentence of imprisonment imposed for the previous offense" unless it would constitute a "serious injustice."

A court may impose a sentence contemplated by a plea agreement; but it is not required to do so. State v. Nance, 228 N.J. 378, 394 (2017); State v. Hess, 207 N.J. 123, 151 (2011). Moreover, the presence of a plea agreement and our exercise of discretion in Soto does not require that we abandon the general principle that, "[w]hen a trial court fails to give proper reasons for imposing

consecutive sentences at a single sentencing proceeding, ordinarily a remand [is] required for resentencing." Randolph, 210 N.J. at 353 (alterations in original) (quoting Carey, 168 N.J. at 424). As the Court has recently held, "an explanation for the overall fairness of a sentence by the sentencing court is required in this setting, as in other discretionary sentencing settings, to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" Torres, 246 N.J. at 272 (alteration in original) (quoting State v. Pierce, 188 N.J. 155, 166-67 (2006)).

With these principles in mind, in the absence of findings by the trial court addressing the Yarbough factors, the overall fairness of the sentence, and the "serious injustice" standard under N.J.S.A. 2C:44-5, "we are compelled to remand this case for resentencing" because "[a] statement of reasons is a necessary prerequisite for adequate appellate review of sentencing decisions." Randolph, 210 N.J. at 353 (quoting State v. Miller, 108 N.J. 112, 122 (1987)). Absent such findings, a reviewing court "cannot determine whether the trial court's imposition of consecutive sentences was a valid exercise of discretion." Ibid. (quoting Miller, 108 N.J. at 122).

We therefore vacate defendant's sentence and remand for resentencing. On remand, the sentencing court shall address and make findings under all

applicable sentencing principles, including findings concerning the <u>Yarbough</u> factors, the overall fairness of the sentence imposed, and the "serious injustice" standard under N.J.S.A. 2C:44-5.

Affirmed in part, vacated in part, and remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1423-18